766 A.2d 299 (2001)
337 N.J. Super. 27
STATE of New Jersey, Plaintiff-Respondent,
v.
Frank E. McDONOUGH, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 11, 2000.
Decided January 26, 2001.
William B. Smith, Assistant Deputy Public Defender, argued the cause for appellant (Ivelisse Torres, Public Defender, attorney; Mr. Smith, of counsel and on the brief).
Joseph Connor, Jr., Assistant Morris County Prosecutor, argued the cause for respondent (John B. Dangler, Morris County Prosecutor, attorney; Mr. Connor, on the brief).
Before Judges SKILLMAN, CONLEY and LESEMANN.
The opinion of the court was delivered by SKILLMAN, P.J.A.D.
Defendant was indicted together with codefendant Michelle LeDonne for capital murder, in violation of N.J.S.A. 2C:11-3(a)(1),(2), and other related charges. At the beginning of the initial joint trial, the codefendant entered into a plea bargain pursuant to which she agreed to plead guilty to reduced charges and testify against defendant. The trial court then declared a mistrial and defendant was subsequently tried alone. After a trial that lasted nearly a month, defendant was found guilty of both murders. In the capital penalty phase of the case, the jury determined not to impose the death penalty. Thereafter, the trial court sentenced defendant to consecutive terms of life imprisonment, with thirty years of parole ineligibility, for each of the murders. Defendant's convictions for conspiracy to commit murder and a weapons offense were merged into his murder convictions.
Defendant's convictions were based on the March 3, 1993 execution-style murders of Clayton Krause and Richard LeDonne in a motel room in Parsippany. Krause and LeDonne both lived in the Pittsburgh area, but stayed at the motel *300 during the week while they worked at a construction site in New York City. Shell casings and bullet fragments found at the murder scene and the autopsies of the victims indicated that the same nine millimeter gun had been used to kill both men.
At the time of the murders, one of the victims, Richard LeDonne, was married to codefendant Michelle LeDonne. Seven months before, Michelle had begun an affair with defendant.
Approximately a month and a half before the murders, the LeDonnes had purchased a $500,000 life insurance policy on the victim's life. This policy was in addition to a $100,000 policy on the victim's life that the LeDonnes had purchased at the time of their marriage on February 14, 1991.
The LeDonnes lived in a duplex home. The other half of the duplex was occupied by a distant cousin of Michelle named Anthony Carelli, Jr., who was a drug addict with a substantial criminal record. Carelli was also an FBI informant. Michelle moved out of the duplex shortly after the murders, first into a newer apartment and later into a home she purchased with some of the proceeds from the insurance policies on her husband's life. However, she continued to have contact with Carelli, and Carelli got to know defendant when he visited Michelle's new home.
According to Carelli, defendant came to him sometime late in 1994 and asked if he "could get rid of a nine millimeter [gun.]" Defendant told Carelli that the weapon was "hot." Carelli agreed to help defendant, and Carelli sold the gun a few weeks later to his cocaine supplier, Lamar Rodgers, in exchange for cash and cocaine.
Shortly after selling the gun to Rodgers, Carelli told the FBI about the transaction. The FBI determined by communications with the Morris County Prosecutor's office that the gun Carelli had sold to Rodgers was the same type of weapon used in the Parsippany murders. The FBI then had Carelli attempt to reacquire the gun from Rodgers. On February 1, 1995, Carelli had a meeting with Rodgers, which the FBI recorded, during which Carelli made an unsuccessful attempt to get the gun back from Rodgers.
About one month later, on March 11, 1995, Rodgers brought the gun to a party in the Pittsburgh area. A fight erupted during the party, which resulted in two persons being shot to death. In the course of this incident, Rodgers fired the nine millimeter gun he had acquired from Carelli numerous times. According to Rodgers, he disassembled the gun after this incident and threw the pieces away. However, the police recovered shell casings and bullet fragments from Rodgers' gun at this crime scene. The State's ballistics expert, Dr. Robert Levine, a firearms examiner with the Allegheny County Coroner's office, concluded that the bullets fired by Rodgers in the Pittsburgh shooting incident were fired from the same gun as the bullets that had killed Krause and LeDonne.
At trial, Michelle LeDonne, Carelli, and Rodgers all testified for the State against defendant. LeDonne denied that she had been involved with defendant in planning the murders. However, she testified that defendant told her a week after the murders that he had killed her husband. According to LeDonne, defendant told her he had driven from the Pittsburgh area to the Parsippany motel where her husband was staying. After Krause responded to a knock on the door to the victims' room, defendant led him into the bathroom and shot him in the head. Richard LeDonne returned to the room a little while later, and defendant then shot him too. According to LeDonne, defendant told her he had committed the murders because he thought her husband had found out about their affair and he was afraid her husband "was going to do something to him." LeDonne also suggested that defendant committed the murders because she had repeatedly told him during their six month *301 affair that she would not leave her husband for him.
Despite being told by defendant that he had murdered her husband, LeDonne continued her intimate relationship with him. In fact, LeDonne and defendant lived together, for at least a substantial part of the time, from the date of the murder until their arrests more than two years later. When the police executed the warrants for the arrests of defendant and LeDonne and the search of their homes, they discovered defendant's clothing and other personal belongings in one of LeDonne's bedrooms and other evidence that indicated he and LeDonne were still living together. The State also presented evidence that during the two-year period following the murders, defendant and LeDonne maintained a lavish lifestyle financed by proceeds from the life insurance policies on Richard LeDonne's life, which included purchasing a home, a Cadillac and a Corvette, and enjoying a lavish vacation in Florida.
Defendant rested without presenting any evidence, and after summations, the jury found him guilty of both murders.
On appeal, defendant presents the following arguments:
I. THE ERRONEOUS ADMISSION OF TESTIMONY TO THE EFFECT THAT WARRANTS HAD BEEN ISSUED FOR THE ARREST OF DEFENDANT AND MICHELLE LEDONNE AND FOR THE SEARCH OF DEFENDANT'S HOME AND THE HOME HE SHARED WITH LEDONNE REQUIRES REVERSAL SINCE IT SUGGESTED TO THE JURORS THAT A JUDGE HAD AT SOME POINT HEARD THE EVIDENCE AGAINST DEFENDANT AND LEDONNE AND HAD DETERMINED THAT SUFFICIENT CAUSE EXISTED TO PLACE THEM UNDER ARREST AND TO SEARCH THEIR HOMES. (Not Raised Below)
II. REVERSAL IS REQUIRED DUE TO PROSECUTORIAL MISCONDUCT DURING OPENING STATEMENT, TRIAL AND SUMMATION. (Not Raised Below)
III. THE TRIAL JUDGE ERRED WHEN HE PREVENTED DEFENDANT FROM PRESENTING EVIDENCE SUPPORTING THE ADMISSIBILITY OF PROOF OF THE RESULTS OF MICHELLE LEDONNE'S POLYGRAPH TESTS.
IV. THE CUMULATIVE EFFECT OF THE ERRORS SET FORTH IN POINTS I THROUGH III, SUPRA, REQUIRE REVERSAL.
V. DEFENDANT'S SENTENCE ON THE MURDER CONVICTIONS MUST BE REVERSED SINCE THE COURT ERRONEOUSLY FOUND THE AGGRAVATING FACTOR SET FORTH IN N.J.S.A. 2C:44-1a(2) TO BE PRESENT.
We conclude that defendant's arguments are without merit and therefore affirm his conviction and sentence.

I
Defendant argues that the admission of testimony indicating that warrants were issued for his arrest and that of LeDonne, and for searches of their homes, requires a new trial because that testimony suggested to the jury that a judge had found sufficient cause to justify the arrests and searches. Defendant did not object at trial to the investigating officers' passing references to the arrest and search warrants or request a cautionary instruction. Therefore, defendant would be entitled to a new trial only if those references were clearly capable of producing an unjust result. R. 2:10-2.
*302 In support of this argument, defendant relies upon State v. Milton, 255 N.J.Super. 514, 605 A.2d 757 (App.Div.1992) and State v. Alvarez, 318 N.J.Super. 137, 145-48, 723 A.2d 91 (App.Div.1999), in which this court held that references to arrest and search warrants suggested that a judge had found that the defendants were involved in criminal activity and that this was clearly capable of producing an unjust result. However, in State v. Marshall, 148 N.J. 89, 239-40, 690 A.2d 1, cert. denied, 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997), our Supreme Court squarely rejected this argument:
Defendant claims that trial counsel should have moved in limine to preclude references to the search warrants in the presence of the jury. Defendant also claims that trial counsel should have objected to police testimony that the search of James Davis's home was executed pursuant to a search warrant. Finally, defendant claims that the prosecutor's reference to the issuance of a search warrant for defendant's telephone records constituted an impermissible reference to a judicial finding of probable cause that defendant was involved with the murder of Maria Marshall.
We find those claims to be without merit. They have in common the proposition that the jury should be shielded from knowledge that search warrants have been issued in a criminal matter because the prior judicial determination of probable cause may influence the jury to assume guilt. We are aware of no authority in support of such a rule. We are satisfied that a properly instructed jury will not presume guilt based on the issuance of a search warrant. We note, moreover, that the fact that a warrant was issued might necessarily be put before a jury in order to establish that the police acted properly.
Defendant's reliance on State v. Milton, 255 N.J.Super. 514, 605 A.2d 757 (App.Div.1992), is misplaced. That case dealt with a prosecutor's reference to a search warrant that had the capacity to mislead the jury. Defendant does not claim that any reference to search warrants in these proceedings was misleading, and we are satisfied from our own review of the record that the references of which defendant complains were accurate.
Insofar as this court's rationale in Milton and Alvarez may conflict with Marshall, we are of course required to follow the Supreme Court's decision in Marshall.
In any event, this case is distinguishable from both Milton and Alvarez. In Milton, the defendant was charged with drug offenses based on evidence obtained in a search of a house that he occupied with his parents and two brothers. The defense was that the drugs found in the search belonged to one of the defendant's brothers. We concluded that the reference during the State's case to a warrant to search the house was not objectionable. 255 N.J.Super. at 520, 605 A.2d 757. However, we reversed the defendant's conviction because the State also presented testimony concerning an unexecuted warrant to search his person. We concluded that this testimony was unnecessary to the presentation of the State's case and that it implied that the State had presented undisclosed evidence to the issuing judge that defendant was likely to be in possession of drugs:
[T]he defendant was unquestionably prejudiced by the mention of the existence of a warrant to search his person. The natural inference from the mention of the warrant itself, confirmed by the cautionary instruction of the trial judge, was that sufficient independent proof had been presented to a neutral judge to believe that defendant would be found in possession of drugs.

[Ibid.]
In Alvarez, the defendant was convicted of various weapons offenses based on evidence obtained in a search of a house where he resided together with other transients. *303 The State presented evidence that the search was conducted pursuant to a warrant and that there also was a warrant for defendant's arrest before the search was conducted. The State did not present any evidence concerning the basis for the issuance of either warrant. The defense was that the weapons were not found in defendant's own bedroom and could have belonged to any of the various other persons who resided in the house. We concluded that evidence of the search warrant was prejudicial because it "suggest[ed] that a judicial officer with knowledge of the law and the facts believed that evidence of criminality would be found in defendant's room[,]" and that "the repetitive references to the arrest warrant for defendant suffer[ed] the exact infirmities we condemned in Milton." 318 N.J.Super. at 148, 723 A.2d 91.
In short, the evidence of the warrants in Milton and Alvarez not only indicated that a judge had found sufficient basis to justify their issuance, but also implied that the State had presented evidence to the judge that was not introduced at trial which indicated that the defendant was likely to be in possession of contraband. Consequently, the evidence of the warrants in Alvarez and Milton had the same capacity for prejudicing the defendant as the hearsay evidence of an informer's tip that the Court found to constitute reversible error in State v. Bankston, 63 N.J. 263, 271, 307 A.2d 65 (1973),that is, that "a non-testifying witness has given the police evidence of the accused's guilt." In fact, Bankston was the sole authority cited by the court in Milton to support its conclusion that evidence of the warrant to search the defendant was inadmissible. 255 N.J.Super. at 520, 605 A.2d 757.
In contrast, the passing reference to the warrants for LeDonne's and defendant's arrests and the searches of their homes did not imply that the State had presented any evidence to the issuing judge that was not also heard by the jury. The jury heard extensive evidence concerning the evidence obtained in the lengthy police investigation that preceded issuance of the warrants. This evidence included the large insurance policies on Richard LeDonne's life, the relationship between Michelle LeDonne and defendant, the information Carelli furnished the FBI that defendant had given him a gun he described as "hot," which was the same type of gun as the murder weapon, and a sworn statement by Rodgers concerning his purchase of the gun from Carelli and the discharge of the gun during the shooting incident in Pittsburgh. The jury also heard evidence that before the warrants were issued in May 1995, Dr. Levine, the firearms examiner in the Allegheny County Coroner's office, had concluded that the bullets fired by Rodgers in the March 11, 1995 shooting incident in Pittsburgh were fired from the same gun used in the murders. Thus, the implication that the State had presented evidence to the issuing judge that was not presented at trial, which we found to require exclusion of the evidence of the search and arrest warrants in Milton and Alvarez, is not present in this case. Instead, the jury heard a wealth of compelling evidence against defendant and the codefendant which obviously had been obtained before the warrants were issued. Therefore, this case is controlled by the Court's holding in Marshall that the jury does not have to be "shielded from knowledge that ... warrants have been issued in a criminal matter because the prior judicial determination of probable cause may influence the jury to assume guilt." 148 N.J. at 240, 690 A.2d 1.
[At the court's direction, its discussion of defendant's other arguments has been omitted from the published opinion.]
Affirmed.