960 A.2d 805 (2008)
404 N.J. Super. 147
STATE of New Jersey, Plaintiff-Respondent,
v.
Kevin C. WILLIAMS, Defendant-Appellant.
DOCKET NO. A-4616-04T4.
Superior Court of New Jersey, Appellate Division.
Argued December 3, 2007.
Decided December 12, 2008.
*806 Shara D. Saget, Assistant Deputy Public Defender, argued the cause for appellant *807 (Yvonne Smith Segars, Public Defender, attorney; Ms. Saget, of counsel and on the brief).
William Kyle Meighan, Assistant Prosecutor, argued the cause for respondent (Marlene Lynch Ford, Ocean County Prosecutor, attorney; Mr. Meighan, on the brief).
Before Judges STERN, COLLESTER and C.S. FISHER.
The opinion of the court was delivered by
COLLESTER, J.A.D.
Tried to a jury, defendant was convicted of first-degree robbery, contrary to N.J.S.A. 2C:15-1 (count one), and second-degree aggravated assault, contrary to N.J.S.A. 2C:12-1(b)(1) (count two). Following the grant of the State's motion for an extended term, he was sentenced on March 18, 2005, to a custodial term of thirty years subject to the No Early Release Act (NERA) on count one and a concurrent term of nine years on count two. On this appeal defendant makes the following arguments:

POINT I  THE COURT ERRED WHEN IT PERMITTED NIELSON TO RETAKE THE STAND, IN VIOLATION OF A SEQUESTRATION ORDER, AND MAKE AN UNRELIABLE VOICE-IDENTIFICATION OF WILLIAMS. (Partially raised below.)
A. THE TRIAL COURT ERRED IN PERMITTING NIELSON TO REMAIN IN THE COURTROOM.
B. THE VOICE IDENTIFICATION WAS INHERENTLY UNRELIABLE AND HIGHLY PREJUDICIAL.

POINT II  THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO CHARGE THE JURY AS TO IDENTIFICATION. (Not Raised Below.)

POINT III  THE TRIAL COURT ERRED WHEN IT PERMITTED OFFICER ALLAIRE TO TESTIFY THAT AN ARREST WARRANT HAD BEEN ISSUED FOR WILLIAMS, DENYING HIM OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, ¶ 1. (Not Raised Below.)

POINT IV  WILLIAMS WAS DENIED HIS RIGHT TO A FAIR TRIAL WHEN THE COURT INCORRECTLY ANSWERED JURY QUESTIONS SUBMITTED. U.S. CONST. AMEND. VI, XIV; N.J. CONST. ART. I, ¶ 1. (Not Raised Below.)
A. THE COURT ERRED WHEN IT INFORMED THE JURORS OF THE ARREST WARRANT.
B. THE TRIAL COURT ERRED WHEN IT COMMENTED ON FACTS NOT IN THE EVIDENCE.

POINT V  THE TRIAL COURT ERRED WHEN IT DENIED WILLIAMS' REQUEST FOR A POSTPONEMENT AND FAILED TO ADVISE HIM THAT HE COULD REPRESENT HIMSELF, RATHER THAN PROCEED WITH UNACCEPTABLE COUNSEL.

POINT VI  THE TRIAL COURT ERRED WHEN IT DENIED THE SUPPRESSION MOTION BECAUSE PROBABLE CAUSE WAS NOT ESTABLISHED OR DETAILED IN THE AFFIDAVIT AND WILLIAMS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION DURING THE SUPPRESSION HEARING U.S. CONST. AMEND. IV; N.J. CONST. ART. I, ¶ 7.

*808 A. RANDOLPH'S STATEMENT TO POLICE WAS UNRELIABLE AND FAILED TO ESTABLISH PROBABLE CAUSE.
B. THE WARRANT AFFIDAVIT FAILED TO ESTABLISH PROBABLE CAUSE.
C. WILLIAMS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION DURING THE SUPPRESSION HEARING.

POINT VII  THE TRIAL COURT IMPOSED AN ILLEGAL SENTENCE, AS WILLIAMS WAS NOT ELIGIBLE FOR AN EXTENDED TERM.

POINT VIII  THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE THE CONVICTION FOR AGGRAVATED ASSAULT WITH THE ROBBERY CONVICTION. (Not Raised Below.)

POINT IX  WILLIAMS' SENTENCE IS MANIFESTLY EXCESSIVE.
On March 7, 2005, at about 4:15 a.m. Jamie Nielson, a garbage truck driver, followed his usual routine and parked his truck in a well-lit area at the side of the Lakewood Sin-Gin gas station. He was listening to the radio while waiting for the gas station to open at 5 a.m. Suddenly the driver's door was yanked open, and two men began hitting Nielson, one beating him with a blunt object wrapped in a wool cap. That assailant yelled, "Give me the money, you motherfucker, or I'll kill you. I want the money. Give me the money from the truck." Nielson locked his arm in the steering wheel, but he was pulled onto the pavement. While one man, later identified as Vernon Randolph, searched the truck cab for money, the other, subsequently identified as defendant, continued to beat Nielson and slam his face into the pavement while demanding money. Nielson tried to crawl under the truck, but he was dragged out. About $40 to $50 was taken from his shirt pocket along with his driver's license, credit cards, and other papers before the assailants fled. Nielson was left bleeding and unconscious on the pavement. After he regained consciousness, Nielson managed to climb back into the truck and find his cell phone. He called 9-1-1 for help and again passed out. His jaw was shattered, his teeth knocked out, his nose broken, his shoulder permanently injured, and he suffered lacerations to his head which required eighteen stitches to close.
Lakewood police officer Pat Carney was the first to respond. Nielson gave him a general description of his assailants as "two black guys, one Hispanic black." This description was broadcast on the police radio shortly after 4:30 a.m. and was heard by Officer Robert Anderson who noticed two men walking on Route 9 who fit the description. When he turned his patrol car around, the men ran in different directions. Anderson pursued Randolph and radioed a description of the other suspect as a stocky, six-foot male wearing a light khaki or light green waistcoat with a grey hooded sweatshirt pulled up over his head.
Officer Patrick Carney searched the area near the Sin-Gin station. He saw footprints in the light dusting of snow that had fallen and followed the trail from the gas station to the backyard of a nearby house where he found $48 in cash and an insurance bill with Nielson's name on it.
Meanwhile, Anderson was able to apprehend Randolph in the parking lot of a nearby shopping center. After other officers arrived, Anderson patted down Randolph for weapons. He noticed blood stains on his pants which subsequent DNA analysis identified as Nielson's blood. At Lakewood police headquarters Randolph *809 was advised of his Miranda[1] rights and gave a taped confession during which he identified defendant as the other assailant. A warrant was issued for defendant's arrest.
Defendant was apprehended on March 18, 2005, almost two weeks after the assault and robbery. Officer Steve Allaire was on foot patrol at about 2 a.m. investigating a report of trespassers at a Lakewood apartment complex. Allaire and his partner saw two men in the area and began to question them. Allaire heard a door close, and he saw defendant walking towards him. Allaire knew defendant by sight and knew there was a warrant for him. He arrested defendant and took him to headquarters where items of defendant's clothing were seized, including boots, a black balaclava,[2] a blue head wrap, and gloves. Stains on one of the gloves were subsequently determined by DNA analysis to be blood of Jamie Nielson.
After Randolph pleaded guilty, defendant went to trial. Jamie Nielson was the State's first witness. He described his assault and robbery and gave the following description of his assailants:
Q. Now, you indicated the one person. Were you able to get a look at these two people?
A. No, not a good look. It's more a general look that I seen them.
Q. Describe for us, if you can, what you do remember from what they looked like?
A. One was a Black man, tall, skinny. One was a short I figured Hispanic, Black, a dark-skinned Black. You know, I don't know what you call it, but a dark-skinned Hispanic person, heavy set.
Q. Okay. So if I understand you right, one person was a taller thinner person?
A. Yes. The Black person was tall and thin.
Q. And the second person?
A. The second, this Spanish-looking Black person, was short and stocky.
Q. Now, when you got dragged from the car  from the truck, who was beating you while you were on the ground?
A. The shorter stocky person.
Q. Okay. And during this beating, did he say anything to you?
A. Oh, yes, constantly berating me, threatening me that he's going to kill me. "I want the money." I don't know what he was talking about, you know. He just kept cursing and threatening, and he just kept beating.
Nielson was then asked about identifying his assailants.
Q. Now, sir, if you were ever to see any of these individuals again, would you be able to recognize them?
A. Truthfully, visually, no, no. But the one person had a voice that I can recognize that's burnt in my memory, yes.
Q. You haven't heard that voice since?
A. Not yet, no.
On cross-examination Nielson repeated his inability to make an identification by sight and his belief that he could identify the voice of his assailant.
Q. Now, you testified that you didn't see, really see anything, did you?

*810 A. I  everything happened so quick, I didn't see a face. I knew they was  you know, what happened to me, I know it was happening to me, but I did not see a face.
Q. Okay. So you can't describe your attackers?
A. No, but I can  but a voice, the voice is burnt in me. If I heard his voice, I could tell you who it is.
Later there was the following exchange:
Q. What made you think it was a Hispanic person?
A. Because of the voice, the accent, the tone of his voice, the accent of his voice, the way he talked. It just had that  I don't know the word to use. It just felt to me that he was Hispanic.
Q. Did he have a 
A. Ghetto-type talk.
Q. But did he have a Spanish accent?
A. It's  well, he didn't have a  how do you put it? He didn't have, like, a plain accent. It was a distinct accent. To me, it sounded more Hispanic.
Q. As opposed to Black?
A. Right, right.
Q. Did he have difficulty speaking English?
A. None, whatsoever, with the words he was using. He kept using the same ones over and over.
Q. And these words you identified with a Hispanic speaker?
A. No, with his accent to it. I don't identify that with all Hispanic people, just the way he was berating me and talking to me that  you know, let's not go there. Do you understand what I'm saying?
Q. And his accent?
A. And his accent, right.
....
Q. Now, even though this heavy-set short Hispanic man was right on top of you, and you were looking right at him, you didn't see his face?
A. It was kind of hard when, you know, you get beat in the face that much, you just don't really see anything. Everything was covered in blood. I just knew what he was doing to me. I could not make out his face. I could not.
After Nielson concluded his testimony, he asked the judge if he could sit in the courtroom during the trial. No objection was made. The trial judge granted Nielson's request and told him to sit in the back of the courtroom.
The State next called Officer Carney, who testified he followed footsteps in the snow and discovered the cash and insurance bill in a nearby yard. He was followed by Detective Anderson who related seeing the suspects walking on Route 9, pursuing them and capturing Randolph. Next to testify was Officer Joseph Prebish. He said he saw Randolph and defendant walking together at about midnight and spoke with them. He said defendant was wearing light-colored pants and a jacket over a gray-hooded sweatshirt. Later at about 2:30 a.m. and at 3:45 a.m. he saw defendant and Randolph walking in the same vicinity near the Sin-Gin gas station. The last witness of the day was Officer Allaire who testified to arresting defendant and taking defendant's boots and clothing he was wearing for purposes of analysis.
The following day the trial prosecutor made an application outside the jury's presence to recall Nielson, stating:
The purpose is the victim was present in court yesterday and heard the defendant speak and is able to identify the defendant as the person who attacked him on March 7th.

*811 THE COURT: Voice identification?
[PROSECUTOR]: Voice identification, yes, sir.
Defense counsel then objected.
[DEFENSE COUNSEL]: Your Honor, my position would be that that witness was sequestered. He was sitting here listening to other testimony as he was making his observations. And it was not anticipated that he was going to be coming back to testify.
The trial judge granted the State's application, stating:
THE COURT: ... Well, in that regard, the victim clearly turned to me, after his testimony yesterday, and asked if he could remain in court. I indicated he could, and no one lodged any objection.
The purpose of his being recalled has nothing to do with testimony that he might have heard that would cause him to add something to the trial, but rather merely indicating that he heard the defendant speak, and that that is the voice which he described yesterday as having been burned into his brain as a result of the traumatic event that he was involved in. So I certainly will allow him to be recalled.
Recalled to the witness stand before the jury, Nielson testified on direct examination as follows:
Q. [S]ubsequent to [testifying], did you have occasion to be in the courtroom?
A. Yes, I was.
Q. And while in the courtroom, did you overhear anything?
A. Yes, I did.
Q. And what was that?
A. I heard the gentleman over there speak.
Q. Now, did you recognize his voice?
A. Yes, I did.
THE DEFENDANT: I object, your Honor. I object, your Honor. I just want my objection noted. You know what I'm saying? He had an opportunity to say, what he's saying now 
THE COURT: Right.
THE DEFENDANT:  when he was on the stand before, and he didn't.
THE COURT: No. He hadn't heard you speak when he was on the stand before. Your objection is overruled.
Q. You indicated you recognize the voice?
A. Yes, I do.
Q. Where do you recognize that voice from?
A. From the day of the attack.
Q. And whose voice was that?
A. That gentleman right there.
Q. And the day of the attack, does that voice belong to one of the persons that attacked you?
A. Yes, it does.
Q. Is there any doubt in your mind?
A. None, whatsoever.
Cross-examination went as follows:
Q. You heard the defendant, my client, utter how many sentences?
A. I heard maybe three sentences, but two works stuck out.
Q. And based on those two words, you're able to make a positive identification of the voice?
A. Yes, I am.
Q. This was the voice that you heard two years ago; correct?
A. Yes, it is.
Q. And how long did you hear that voice two years ago?
A. How long?
Q. Um-hum.
A. As long as he was beating me, every other word was that word out of his *812 mouth that you spoke yesterday. It's kind of burnt into my brain.
Q. Do you recall how many times he used that particular word?
A. I'd be guessing, but it had to be at least fifty times, if not more.
Q. And what was that word?
A. "Mother fucker."
The State continued its case by calling Sheriff's Officer Robert E. Johnson, Jr., who collected and processed various items in evidence including the clothing worn by defendant. Detective Toni Pettincki of the New Jersey State Police Office of Forensic Sciences, next testified that she found a presumptive test positive for blood on one of the gloves in defendant's possession when he was arrested. She cut out the area of the stain and submitted it for DNA analysis. Her testimony was followed by Teri McIntosh, a DNA forensic scientist with the New Jersey State Police DNA Laboratory, who compared a buccal swabbing from Jamie Nielson and the blood stained section of the defendant's glove. She concluded that the specimen from the glove matched the victim's DNA and that therefore Jamie Nielson's blood was on the defendant's glove. Following this testimony the State rested. Defendant did not testify[3] and called no witnesses.
Defendant first contends that the trial judge erred in permitting Nielson to remain in the courtroom after his testimony because witnesses had been sequestered.[4]
We note at the outset that there was no objection to Nielson remaining in the courtroom after he testified and no indication in the trial record and no argument by defendant on appeal that the State intended to recall Nielson after he concluded his initial testimony. Nor is there any indication that the State connived with Nielson to have him sit in the courtroom with the expectation that he would overhear the defendant speak to identify defendant as his assailant.[5] We further note the statement in both briefs that identification was not the key issue in the case.
Sequestration of witnesses is governed by N.J.R.E. 615, which states, "[a]t the request of a party or on the court's own motion, the court may, in accordance with the law, enter an order sequestering witnesses." Sequestration is discretionary with the trial judge. State v. Miller, 299 N.J.Super. 387, 399, 691 A.2d 377 (App.Div.), certif. denied, 151 N.J. 464, 700 A.2d 877 (1997). Its purpose is "to prevent prospective witnesses from hearing what the other witnesses detail in their evidence, `for the less a witness hears of another's testimony, the more likely is he to declare his own knowledge simply and unbiased.'" State v. DiModica, 40 N.J. 404, 413, 192 A.2d 825 (1963) (quoting State v. Zellers, 7 N.J.L. 220, 226 (Sup.Ct. 1824)). Absent a clear showing of prejudice an inadvertent violation of a sequestration order does not trigger automatic exclusion of the witness' testimony. See State v. Smith, 55 N.J. 476, 483, 262 A.2d 868 (1969), cert. denied, 400 U.S. 949, 91 S.Ct. 232, 27 L.Ed.2d 256 (1970); State v. Dayton, 292 N.J.Super. 76, 91, 678 A.2d *813 299 (App.Div.1996); State v. Horton, 199 N.J.Super. 368, 372-73, 489 A.2d 1164 (App.Div.1985); State v. Tillman, 122 N.J.Super. 137, 143-44, 299 A.2d 419 (App. Div.), certif. denied, 62 N.J. 428, 302 A.2d 132 (1973).
In the instant case there was no violation of a sequestration order or insult to the purpose of sequestration. Nielson had concluded his testimony, and there was no intention to recall him at that time. Even assuming (which we do not) that the sequestration order somehow extended beyond the conclusion of Nielson's testimony, the trial judge  without objection  permitted Nielson to sit in the back of the courtroom, thereby releasing him from the confines of witness sequestration. There is no reason to conclude that the court abused its discretion by granting Nielson's request to sit in the courtroom and observe the trial; indeed, the judge directed Nielson to sit in the back of the courtroom so that his presence would not distract the jury. Furthermore, permitting Nielson to be recalled did not compromise the purpose of a sequestration order, which is to prevent a witness from hearing testimony of other witnesses and "tailoring" his or her testimony accordingly. Certainly the police testimony heard by Nielson in no way related to his subsequent voice identification of defendant as his assailant.[6]
We next address the issue raised by defendant that by permitting the victim to remain in the courtroom violated his constitutional rights.[7] A criminal defendant has no federal constitutional right to exclude witnesses from the courtroom. United States v. Edwards, 526 F.3d 747, 758 (11th Cir.2008); Bell v. Duckworth, 861 F.2d 169, 170 (7th Cir.1988), cert. denied, 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989); Mathis v. Wainwright, 351 F.2d 489 (5th Cir.1965), cert. denied, 384 U.S. 1009, 86 S.Ct. 1960, 16 L.Ed.2d 1021 (1966). On the other hand, Nielson had a constitutional right to remain in the courtroom under the Victims' Rights Amendment to the New Jersey Constitution, which states:
A victim of a crime shall be treated with fairness, compassion, and respect by the criminal justice system. A victim of a crime shall not be denied the right to be present at public judicial proceedings except when, prior to completing testimony as a witness, the victim is properly sequestered in accordance with law or the Rules Governing the Courts of the State of New Jersey....
[N.J. Const. Art. 1 ¶ 22.]
The Victims' Rights Amendment was the culmination of efforts in New Jersey to afford victims status in the courtroom and to "enhance and protect the necessary role of crime victims and witnesses in the criminal justice process." N.J.S.A. 52:4B-36(d). *814 See State v. Timmendequas, 161 N.J. 515, 554-56, 737 A.2d 55 (1999), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151 L.Ed.2d 89 (2001); State v. Muhammad, 145 N.J. 23, 42-43, 678 A.2d 164 (1996); State v. Ruffin, 371 N.J.Super. 371, 387, 853 A.2d 311 (App.Div.2004); State in the Interest of K.P., 311 N.J.Super. 123, 136, 709 A.2d 315 (Ch.Div.1997); see generally, Douglas E. Beloof, Constitutional Implications of Crime Victims as Participants, 88 Cornell L. Rev. 286 (Jan. 2003).
New Jersey was one of the first states to provide for victim compensation under the Criminal Injuries Compensation Act of 1971 (N.J.S.A. 52:4B-1 to 4B-70) and for a Crime Victims' Bill of Rights in 1985 (N.J.S.A. 52:4B-34 to 4B-38). The Victims' Rights Amendment was overwhelmingly approved by the electorate with over 1,200,000 voting for it and only 223,248 voting against it. Muhammad, supra, 145 N.J. at 43, 678 A.2d 164. In the past two decades all states have adopted victims' rights statutes as has the federal government in the Crime Victims' Rights Act, 18 U.S.C. § 3771, and thirty states have provided for victims' rights in state constitutions. See generally, Beloof, supra, 88 Cornell L. Rev. 282 at 286 (Jan. 2008).[8]
The rationale for the inclusion of the right to be present in the constitutional amendment was stated by then Attorney General Robert Del Tufo in his testimony before the Assembly Judiciary, Law and Public Safety Committee.
Moreover, there have lately been outrageous incidents in which crime victims and or their families have been excluded from the courtroom on the ground that their presence would generate such undue sympathy in the minds of the jurors as to prevent a fair trial for the defendant. A public trial should mean just that. And those who have had their lives forever maimed and changed by violent acts are not only part of the public but also have a special standing to be present and to observe the system at work.
The proposed constitutional amendment will expressly require that victims of crime be treated fairly and with compassion by the criminal justice system; it will also help to prevent victims from being excluded from proceedings. On the latter score, protection for crime victims by constitution rather than simply by statute is important. The rights of the accused are set out in the constitution and the rights of a victim should be given, if not equal, at least recognizable constitutional status. This will aid victims if and when their exclusion from the courtroom is sought.
Our Supreme Court has reaffirmed that the trial judge is to consider the concerns of the victim and the victim's family provided that the defendant's constitutional rights are not impinged. Timmendequas, supra, 161 N.J. at 554-56, 737 A.2d 55. See also State v. Means, 191 N.J. 610, 620, 926 A.2d 328 (2007) (holding that due process concerns prevented the court from setting aside plea agreement based solely on prosecutor's failure to notify victim of the State's plea offer). In this case, the defendant acknowledges that Nielson had a right under the Victims' Rights Amendment *815 to be in the courtroom after he finished his testimony. Yet he argues that Nielson's presence deprived him of a right to a fair trial because Nielson was then in a position to hear him speak and identify him as the assailant. But as we have indicated supra, defendant had no constitutional right to exclude Nielson from the courtroom while Nielson had a constitutional right to remain after concluding his testimony.
Defendant points to no federal constitutional right to trump the victims' rights amendment under the Supremacy Clause. He was not deprived of his constitutional right of confrontation since Nielson was cross-examined on his voice identification. See Stephens v. State, 290 Ark. 440, 720 S.W.2d 301 (1986). There was no violation of his constitutional privilege against self-incrimination because his vocal statements were not testimonial in nature and were considered only on the issue of his identification as the assailant. N.J.S.A. 2A:84A-19. See also State v. King, 44 N.J. 346, 357, 209 A.2d 110 (1965). Furthermore, there was no violation of any due process rights of defendant. See Wheeler v. State, 88 Md.App. 512, 596 A.2d 78 (1991); State v. Fulminante, 193 Ariz. 485, 975 P.2d 75 (1999); see generally, Jay M. Zitter, Validity, Construction and Application of State Constitutional or Statutory Victims' Bill of Rights, 91 A.L.R. 5th 343, 373-75 (2001).
A case much on point is Stith v. State, 201 Ga.App. 621, 411 S.E.2d 532 (1991). The defendant argued the trial judge abused discretion by permitting the State to reopen its case and, in spite of the sequestration order, to recall the victim to testify that he recognized defendant as the offender after hearing the sound of defendant's voice when he was testifying. The Georgia Court of Appeals rejected the argument, stating:
Discretion was not abused because the purpose of the rule was not compromised. The purpose of the rule of sequestration is to prevent a witness who has not testified, or who had not completed his or her testimony, from overhearing and having his or her testimony affected by the testimony of another witness. Almond v. State, 173 Ga.App. 423, 424(1), 326 S.E.2d 798 (1985). Here, the victim was not recalled following appellant's testimony in order to further or alter the substance of his own recounting of the incident in light of the substance of appellant's testimony. He was recalled merely to testify about the similarity of the sound of the witness' voice to the sound of the gunman's voice during commission of the crimes. Identification was the issue, not the content of appellant's overheard testimony.
[Stith, supra, 411 S.E.2d at 533.]
Another factually similar case is State v. Walker, 2003 Ohio 986, 2003 WL 757525 (Ohio App. 10th Dist.2003), certif. denied, 99 Ohio St.3rd 1455, 790 N.E.2d 1218 (2003). There the victim was unable to identify defendant from a photo array, but he was positive defendant was the robber after hearing the defendant's voice in an exchange between the defendant and the judge. Although the victim had not yet testified when he heard defendant speak and was thereby in violation of the sequestration order, the trial judge permitted the testimony and denied a mistrial. The Ohio Court of Appeals affirmed.
Also on point is State v. Swinton, 268 Conn. 781, 847 A.2d 921, 962 (2004). After an order of sequestration, the murder victim's sister completed her testimony, and no request was made that she be further sequestered. She remained in the courtroom and was later recalled to testify about an incident she observed in court. She said that while a State's witness testified *816 to having heard an incriminating conversation between defendant and his brother, the defendant reacted with "ugly" gestures as he turned toward his brother seated behind him. The defendant's objection to the testimony was overruled because defendant had not renewed his sequestration claim after the victim's sister testified, and the Connecticut Supreme Court agreed.
In this case Nielson was properly in the courtroom, and there is no reason why he could not make an identification of defendant based on what he heard there  just as he could outside the courtroom if he heard defendant speak. Furthermore, the defendant's contention that Nielson's identification was unduly suggestive and unreliable is without merit. There was no suggestive procedure involved in the voice identification to give rise to a likelihood of irreparable misidentification. An in-court voice identification is no more suggestive than the in-court visual identification of a defendant seated at the defense table. Stith, supra, 411 S.E.2d at 533. There is nothing to indicate that the identification was unreliable. On the contrary, the "totality of the circumstances" indicate that the identification was sufficiently reliable to be considered and evaluated by the jury following cross-examination. Compare Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972).
Defendant further argues that since Nielson described the voice of his assailant as "Hispanic" speaking "ghetto-type talk," his voice identification was inadmissible because identification of a person's race by voice results in "court-sanctioned racial stereotyping." Defendant cites no case in support of this proposition, and it lacks merit in these circumstances. Nielson's identification of his assailant's voice was not based on racial stereotyping. His testimony about the assailant's voice and the characterization of "ghetto-type talk" was in response to defense counsel's request to describe the voice and manner of speaking.
Defendant also contends that the trial court committed plain error by not giving a specific identification charge to the jury. Defendant relies upon State v. Green, 86 N.J. 281, 291-92, 430 A.2d 914 (1981) in which the Supreme Court held that in a case in which eyewitness identification is the key issue, a specific charge must be given that the State has the sole burden to prove beyond a reasonable doubt that it was the defendant who committed the offense and that the failure to give the specific charge constituted plain error. The critical facts of Green were that there was one eyewitness whose prior identifications were inconsistent, and the lighting at the scene of the crime was poor. Significantly, there was no corroboration or forensic evidence so that the danger of a mistaken identification was "particularly significant."
The instant case is clearly distinguishable from Green. The defendant acknowledges that the voice identification was not the key factor in the case. Moreover, the State's other proofs were strong. The defendant was seen on foot near the Sin-Gin station both before and after the assault and robbery. There was testimony he ran from the police. Finally there was overwhelming DNA evidence that Nielson's blood was on the defendant's glove.
This case closely resembles State v. Gaines, 377 N.J.Super. 612, 873 A.2d 688 (App.Div.), certif. denied, 185 N.J. 264, 883 A.2d 1061 (2005), in which Green was distinguished because the eyewitness identification was corroborated by persuasive forensic evidence. Similarly, in State v. Copling, 326 N.J.Super. 417, 434, 741 A.2d 624 (App.Div.1999), certif. denied, 164 N.J. 189, 752 A.2d 1290 (2000), where the State's proofs were a mixture of identification *817 and circumstantial evidence, we held that "given the strengths and sources of the circumstantial evidence, the issue of identification was not a key issue. Thus, a jury instruction specifically on identification was unwarranted." We so hold in this case as well and find in any event, given the other proofs, that any error in the admission of the voice identification was harmless beyond a reasonable doubt. State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).
Defendant's next argument focuses on a comment made by Officer Allaire during his direct examination. Describing the circumstances of his apprehension of defendant, Allaire said that after he heard a door close outside the apartment building, he saw the defendant. He next testified: "I approached him and advised that he had a warrant for his arrest and placed him under arrest." No other reference to the arrest warrant was made during the course of the trial. Defendant argues that this testimony was highly prejudicial and in violation of both State v. Milton, 255 N.J.Super. 514, 605 A.2d 757 (App.Div. 1992) and State v. Alvarez, 318 N.J.Super. 137, 145-48, 723 A.2d 91 (App.Div. 1999) in which we held that references to search warrants and arrest warrants suggested that a judge previously found that the defendants were engaged in criminal activity and as such constituted plain error because the references were clearly capable of producing an unjust verdict. R. 2:10-2. However, as we subsequently noted in State v. McDonough, 337 N.J.Super. 27, 32, 766 A.2d 299 (App.Div.) certif. denied, 169 N.J. 605, 782 A.2d 423 (2001), the Supreme Court squarely rejected this argument in State v. Marshall, 148 N.J. 89, 239-40, 690 A.2d 1, cert. denied, 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997).
Furthermore, even assuming the viability of Milton and Alvarez, the case at bar is factually distinguishable. In Milton defendant was charged with drug possession based upon a search warrant of the house he shared with his parents and brothers. The defense was that the drugs found belonged to one of the defendant's brothers. We held that the reference to this search warrant was not objectionable, but we reversed the conviction because the State further made reference to an unexecuted warrant to search the defendant's person. We found that the natural inference from the mention of the latter warrant was that proof outside the record had been presented to a neutral judge to the effect that defendant was in possession of drugs. Milton, supra, 255 N.J.Super. at 520, 605 A.2d 757.
In Alvarez the defendant was convicted of certain weapons offenses based on evidence obtained following execution of a search warrant. The defense was that the weapons could have belonged to other persons who resided in the house. In addition to the search warrants there was a parole board arrest warrant. The judge eliminated any reference to the parole board, but ruled that the arrest warrant could be cited as the reason for the presence of the police at the defendant's residence. He also permitted testimony as to the search warrant of the premises without drawing the same distinction made in Milton between a warrant to search the premises and a warrant to search the person. We held that the evidence of the search warrant was prejudicial because it suggested that a judicial officer believed, based on facts not presented to the jury, that evidence of criminality was to be found at defendant's residence and that the repeated references to the search warrant prejudiced the defendant and constituted plain error.
As in McDonough, the passing reference to an arrest warrant did not imply that the *818 State had any evidence in addition to that which was heard by the jury; which at that point in time consisted of the victim's testimony, the testimony that defendant and Randolph were on foot in the area of the assault and robbery prior to the criminal incident, and the testimony by Detective Anderson that he observed defendant and Randolph, that they fled from him and that he pursued and captured Randolph. All of this information relating to events prior to the issuance of the arrest warrant against defendant was presented to the jury before Anderson testified. Therefore, as we stated in McDonough, supra, 337 N.J.Super. at 35, 766 A.2d 299, the case is controlled by the holding in Marshall that the jury does not have to be "shielded from knowledge that ... warrants have been issued in a criminal matter because the prior judicial determination of probable cause may influence the jury to assume guilt." Marshall, supra, 148 N.J. at 240, 690 A.2d 1.
Furthermore, Marshall indicates that the mention of a warrant is not fatal to the prosecution because, "[t]he fact that a warrant was issued might necessarily be put before the jury in order to establish that the police acted properly." So in this case, the mention of a warrant gave the reason for Allaire's placing defendant under arrest. And in any event, we underscore that the reference for the warrant was fleeting and was at best harmless error when considering the overwhelming forensic proof against defendant. See, e.g., State v. Slobodian, 57 N.J. 18, 23, 268 A.2d 849 (1970), certif. denied, 62 N.J. 77, 299 A.2d 75 (1972).
Defendant's next argument relates to six questions asked by the jury during the course of its deliberations. Prior to having the jury return to the courtroom and responding to the questions, the judge conferred with counsel in chambers and then stated on the record, "We've received a series of questions from the jury. I've reviewed the questions with counsel in chambers, and counsel have agreed upon the responses thereto. So we'll call the jury out and we'll give them agreed-to responses." Accordingly, not only was there no objection to the court's challenges, but the defense participated in forming the responses. As such, the factual assertions by the court constituted stipulated facts. N.J.R.E. 101(a)(4). Furthermore, we find no basis for defendant's contention that the responses were capable of producing an unjust result.
Defendant states that the trial court erred in denying his application for a postponement and failed to advise him of his right to proceed pro se rather than with counsel with whose services he was dissatisfied. There is no merit to the argument. First of all, in the pre-trial status hearing it was clear that defendant did not wish to proceed pro se but rather to have his assigned counsel relieved. At the hearing, other counsel appeared and stated that defendant had asked him on at least two occasions to replace the assigned counsel, but that he told defendant that there was no reason or basis for the change. Defendant then spelled out his reasons for desiring to change counsel as follows:
You know what I'm saying, defense of any type of case or whatever, whether it be civil or criminal, it starts with the lawyer, ... that's why the Court appoints a lawyer to a defendant.... I just want everybody to know, you know what I'm saying, this guy doesn't have my best interests at heart. Me and him would have had like three or four confrontations already. Me, I'm cussing him out because he don't want to do his job, Your Honor.
All, I'm requesting is, therefore, Mr. Somers be taken off my case, and therefore *819 ... I basically don't want any lawyer, pool attorney from Ocean County, I've been dealing with the courts here, you know what I'm saying, because to me they ain't nothing but in cahoots with the prosecution.
While an indigent defendant must be afforded counsel, he has no right "to select counsel who will completely satisfy a defendant's fancy as to how he is to be represented." State v. Rinaldi, 58 N.J.Super. 209, 156 A.2d 28 (App.Div. 1959), cert. denied, 366 U.S. 914, 81 S.Ct. 1089, 6 L.Ed.2d 238 (1961). See also State v. McCombs, 171 N.J.Super. 161, 165, 408 A.2d 434 (App.Div.1978), aff'd, 81 N.J. 373, 408 A.2d 425 (1979). The trial judge did not err in declining to remove trial counsel and replace him with counsel of defendant's choice.
Defendant next argues that the trial court erred in denying his motion to suppress his arrest warrant, arguing that probable cause did not exist to justify the arrest, that the arrest was based upon an unreliable statement by the co-defendant and that the use of the co-defendant's statement to obtain the warrant denied defendant's right to confrontation with the co-defendant as his accuser. None of the arguments are persuasive.
As a threshold matter, we note that Officer Allaire arrested defendant on the street outside of an apartment house. Police do not need a warrant to make an arrest in a public place. State v. Nikola, 359 N.J.Super. 573, 582, 821 A.2d 110 (App.Div.), certif. denied, 178 N.J. 30, 834 A.2d 404 (2003). Rather, the requirement for making an arrest in a public place is probable cause. United States v. Watson, 423 U.S. 411, 417-23, 96 S.Ct. 820, 824, 46 L.Ed.2d 598, 605 (1976) (with regard to an arrest in a public place, "[t]he necessary inquiry, therefore, was not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest"). Here Allaire was aware of the warrant and the underlying facts surrounding the crime at the Sin-Gin gas station. He was aware of the defendant's identify and was actively looking for the defendant pursuant to the police posting of a BOLO (be on the look out). Furthermore, Allaire did not have to simply rely on his own knowledge; rather, he was entitled to rely on the underlying police work of other officers who investigated the crime, identified the defendant, and secured the warrant. State v. Crawley, 187 N.J. 440, 457, 901 A.2d 924, cert. denied, 549 U.S. 1078, 127 S.Ct. 740, 166 L.Ed.2d 563 (2006). Therefore, there was probable cause for Allaire to arrest defendant outside the apartment building regardless of the warrant.
Defendant next argues that the identification of defendant as one of the assailants by co-defendant Randolph was unreliable due to Randolph's alleged intoxication at the time he gave the taped statement inculpating defendant. However, the trial judge found that Randolph was coherent, that there was no slurring of his speech, and that he spoke articulately in response to questions put to him. We find no basis upon which to upset this finding by the trial judge.
Lastly, defendant argues that he was denied his Sixth Amendment right to confrontation during the suppression hearing by his inability to confront Randolph. He asserts the applicability of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) in which the United States Supreme Court addressed the question as to whether a witness prior sworn statement to the police could be admitted into evidence as a statement against penal interest after the witness invoked the marital privilege and refused to testify at the *820 trial. The court held that "where testimonial statements are in issue, the only indicium of reliability sufficient to satisfy constitutional demands is confrontation." 541 U.S. at 69, 124 S.Ct. at 1355, 158 L.Ed.2d at 203. However, Crawford is inapplicable to the instant case since Randolph's statement was not used at the trial but during a suppression hearing.
Defendant's remaining arguments relating to his conviction are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).
With regard to defendant's sentence, the State concedes that there must be a remand for merger of the convictions for aggravated assault and first-degree robbery. We agree. We also remand for resentencing on the extended term pursuant to State v. Pierce, 188 N.J. 155, 902 A.2d 1195 (2006).
Affirmed. Remanded for re-sentencing.
FISHER, J.A.D., concurring.
I concur in the judgment of the court. I write separately only to indicate that I do not believe we should address what the trial judge should have done (or would have done) had defense counsel objected to Nielson's remaining in the courtroom following his initial testimony. The fact is that defense counsel did not object or seek a representation from the prosecution as to whether Nielson would be recalled, which I would find fatal to defendant's argument in this direct appeal. As a result, in order to fully dispose of this appeal, we need not determine whether in these circumstances Nielson had a constitutional right to remain in the courtroom after his initial testimony.
Despite having found dispositive defense counsel's failure to object  coupled with the repeated reference to defendant's position on appeal that identification was not the "key" issue in this case  the majority has nevertheless reached out and held that "defendant had no constitutional right to exclude Nielson from the courtroom while Nielson had a constitutional right to remain after concluding his testimony." 404 N.J.Super. at 163, 960 A.2d at 815.[1] In finding a victim's constitutional right to remain in a courtroom in these circumstances, the majority relies upon a state constitutional provision that recognizes a victim's right "to be present at public judicial proceedings," N.J. Const. art. I, ¶ 22, and appears to conclude that this right overrides an accused's right to the enforcement of a valid sequestration order. Because, immediately following the declaration of the victim's right, this constitutional provision qualifies the victim's right to be present by declaring that it does not have application "when, prior to completing testimony as a witness, the victim is properly sequestered in accordance with law or the Rules Governing the Courts of the State of New Jersey," N.J. Const. art. I, ¶ 22, I am not persuaded by the majority's resolution of this nascent constitutional issue. Indeed, a plain reading of this constitutional provision strongly suggests to me that an accused's right to the enforcement of a valid sequestration order outweighs a victim's right to be present at trial.[2] I acknowledge, however, that the line between these competing rights is greatly blurred by the peculiar circumstances of this case *821 and rendered murkier still by defense counsel's failure to object or seek some understanding  once Nielson requested the right to remain in the courtroom  as to whether the prosecutor intended to later call Nielson to the stand.
Unlike the majority, I am disinclined to weigh in on the potential outcome of these conflicting constitutional rights because that determination is unnecessary to a full disposition of this aspect of the appeal. For me, it is sufficient that we reject defendant's argument that his right to a fair trial was infringed by these circumstances solely because his attorney never objected nor invoked his right of sequestration when Nielson requested the right to remain in the courtroom. Courts should not reach constitutional issues unless absolutely imperative in disposing of the litigation at hand. See State v. Reid, 194 N.J. 386, 399-400 n. 3, 945 A.2d 26 (2008); State v. Delgado, 188 N.J. 48, 64 n. 10, 902 A.2d 888 (2006); Bell v. Twp. of Stafford, 110 N.J. 384, 389, 541 A.2d 692 (1988).
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] A wool-type hat often used in skiing that can cover most of the face with the eyes, nose, and mouth exposed.
[3] The defendant's decision was made after the State indicated it would seek the use of defendant's convictions to impeach his testimony if he testified. They included three second-degree offenses, three third-degree offenses, and one fourth-degree offense.
[4] While the trial transcript does not mention an order for sequestration, both counsel agree that the judge ordered witnesses to be sequestered.
[5] We do not preclude a petition for post-conviction relief on this issue if there is any basis for such assertion.
[6] Nielson's testimony was that he heard the defendant speak and say the word, "motherfucker," which does not appear in the trial record. Notably, neither the prosecutor nor defense counsel inquired of Nielson whether he heard defendant speak the profanity during testimony, the afternoon recess, or after the proceedings concluded. The trial transcript does show defendant did speak on the record during the course of the police testimony. After a sidebar conference, he uttered the words, "This sucks," and spoke at some length while making a pro se objection. The only time the defendant used the particular profanity was outside the jury's presence at the onset of the trial when he called his lawyer a "lying motherfucker." On another occasion, the judge had defendant removed from the courtroom but there is an absence in the trial record as to what he said or did to cause his removal.
[7] We acknowledge our concurring colleague's position, but we believe that the matter should be addressed, since defendant has raised the issue.
[8] The victim's right to be present in the courtroom was not specifically listed in the New Jersey Crime Victims' Bill of Rights statute, N.J.S.A. 52:4B-36. A ploy used to exclude the victim was to subpoena him or her as a witness and then disingenuously argue that the victim must be excluded under a sequestration order. But see State ex rel V.M., 363 N.J.Super. 529, 536, 833 A.2d 692 (App.Div. 2003) (to properly exercise discretion on a sequestration request, the court must be informed of the anticipated subject matter of the testimony).
[1] As the record reveals, the majority's broad constitutional holding only begs the question because Nielson had not "concluded his testimony," as evidenced by the prosecution's recalling of Nielson to the stand during its case-in-chief.
[2] Similarly, the "Crime Victim's Bill of Rights" adds no weight to the majority's position since it does not include a victim's right to remain in the courtroom during trial. See N.J.S.A. 52:4B-36.