# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3620-23
A-3621-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANACY,

     Plaintiff-Respondent,

v.

P.A.A. and R.S.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF F.A.A.,
a minor.

_____

Submitted March 18, 2025 – Decided May 19, 2025

Before Judges Gooden Brown and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0027-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant P.A.A. in A-3620-23 (Bruce P. Lee, Designated Counsel, on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant R.S. in A-3621-23 (Louis W. Skinner, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor F.A.A. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendants P.A.A.[1] and R.S. appeal from the June 28, 2024 judgment of guardianship terminating their parental rights to their daughter, F.A.A., born November 2020. Shortly after the child's birth, the Division of Child Protection and Permanency (Division) removed F.A.A. from P.A.A.'s custody due to her unaddressed mental health issues and her noncompliance with treatment. P.A.A. was diagnosed with schizoaffective and bipolar disorders, has been hospitalized multiple times, and is prescribed a

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials or pseudonyms to protect the confidentiality of the participants in these proceedings.

variety of medications. P.A.A. has a long history with the Division and has two other children who are no longer in her care. R.S. was incarcerated shortly after F.A.A.'s birth, has a history of alcoholism, and was inconsistent with services.

F.A.A. was placed with E.J., a non-related resource parent, upon removal. After residing in an out-of-home placement with E.J. for over three years while the Division offered defendants services to facilitate reunification, a four-day guardianship trial and best interests hearing were conducted in June 2024, ending on June 28, 2024, with the termination of defendants' parental rights.

On appeal, P.A.A. challenges the judge's findings on prongs one, two, and three of the best interests standard codified in N.J.S.A. 30:4C-15.1(a), arguing the judge erred in concluding that mental illness was a basis for terminating parental rights and a bar to kinship legal guardianship (KLG). P.A.A. also raises various evidentiary issues and faults the judge for failing to sua sponte sequester a Division witness. R.S. challenges the judge's findings on all four prongs of the best interests standard, arguing his behavior never caused F.A.A. harm; he was willing and able to remediate any alleged harm; the Division failed to provide him with needed services, including finding stable housing; the judge disregarded the statutory mandate for KLG over adoption to maintain familial connection; and the judge conducted a "better off" analysis, which is not the

standard for the fourth prong. He seeks a permanency plan of KLG with placement with his relatives, his second cousin D.H. and D.H.'s wife, C.M.

The Division asserts the judge's decision is supported by overwhelming evidence in the record and should be affirmed. The Law Guardian supports termination on appeal. Having reviewed the extensive record, the parties' arguments, and the applicable legal principles, we affirm.

I.

By way of background, N.J.S.A. 30:4C-15.1(a), as revised in 2021, requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

The Division "bears the burden of proving each of those prongs by clear and convincing evidence." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 606 (2007). The four criteria "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 166 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 506 (2004)). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999) (quoting In re Adoption of Child. by L.A.S., 134 N.J. 127, 139 (1993)).

II.

Turning to the specific circumstances in this case, on September 11, 2023, the Division filed a verified complaint to terminate defendants' parental rights and obtain guardianship of F.A.A., followed by adoption. The Division first became involved with P.A.A. in 2001 when it provided services, including psychiatric and psychological evaluations and treatment, for her substance abuse and mental health problems. P.A.A. had a lengthy history of hospitalizations for psychiatric issues and noncompliance with prescribed psychotropic

5

medications. The Division's involvement led to the eventual removal of P.A.A.'s other two children, born in 2001 and 2012.

A. 2020 Removal of F.A.A.

By June 2020, P.A.A. was suffering from another psychiatric episode where she insisted that she was the Attorney General for the State of New Jersey. She was pregnant with F.A.A. and not taking her prescribed medications. On November 2, 2020, the day of F.A.A.'s birth, P.A.A. tested positive for marijuana. She left the hospital the following day against medical advice. The Division removed F.A.A. from P.A.A.'s care due to concerns about P.A.A.'s mental health. T.A., P.A.A.'s mother, was ruled out as a placement option after she informed the Division she was unable to care for F.A.A. because she resided in a senior home and was caring for her own parent. As a result, F.A.A. was placed with a non-relative resource parent, E.J., with whom she resides to this day.

After the Division obtained custody of F.A.A., it arranged for P.A.A.'s treatment at a partial inpatient program, which P.A.A. declined. The Division also provided weekly supervised visits with F.A.A. During these visits, P.A.A. exhibited unusual behaviors, including arriving to the visit with her belongings in a cart, talking to herself, pacing the floor, and refusing to hold, engage, or

6

speak with F.A.A.  P.A.A. also acted aggressively towards Derrick McKie, the Division's case manager, as a result of which McKie was unable to visit her home alone.  P.A.A. was again hospitalized at a psychiatric hospital in December 2020 but refused to attend post-discharge services and telehealth appointments after discharge.

## B.  2021

Throughout January 2021, P.A.A. continued to display signs of mental illness, was noncompliant with medications, and declined to participate in her telehealth therapy appointments due to her fear that her phone had been compromised.  She also missed two weekly visits with F.A.A.  During a supervised visit on February 25, 2021, McKie observed P.A.A. place F.A.A. face down on a changing mat as the child cried.  P.A.A. then shoved F.A.A.'s head into the mat when F.A.A. moved her head around.  McKie removed the child and promptly ended the visit.  He was uncertain if P.A.A. had tried to suffocate F.A.A.  P.A.A. had no recollection of the incident and later denied that she would engage in such behavior.

On February 23, 2021, Alison Strasser Winston, Ph.D., performed a psychological evaluation of P.A.A.  Winston explained that P.A.A. had a loose grasp on reality, failed to comprehend that F.A.A. was her child, and lacked the

7

knowledge and desire to care for a child. Winston diagnosed P.A.A. with schizoaffective disorder, bipolar type. According to Winston, the disorder would negatively affect P.A.A.'s ability to parent. Winston recommended that P.A.A. engage in therapeutic visitation, attend a partial hospitalization program, participate in medication monitoring, complete parenting skills classes, and attend a substance abuse evaluation.

Samiris Sostre, M.D., subsequently performed a psychiatric evaluation of P.A.A. and confirmed Winston's diagnosis that she suffered from schizoaffective disorder, bipolar type. Sostre noted that P.A.A. had a limited understanding of her mental disorder and became symptomatic even when she took her medications.

P.A.A. started her recommended psychiatric and therapeutic services at the Northwest Essex Community Healthcare Network (Northwest) in April 2021. There, she also received medication to treat bipolar disorder. However, Northwest determined that she needed a higher level of care and referred her to Mt. Carmel Guild. By October 2021, P.A.A. began therapy at Mt. Carmel Guild. However, she only attended services sporadically and did not consistently take her medications. Meanwhile, under the supervision of Care Plus, a service provider, P.A.A. consistently attended therapeutic visitation with F.A.A.

8

As for R.S., after the Division contacted him about F.A.A.'s removal, he delayed meeting with Division staff. He was later incarcerated in Essex County supposedly for violating a restraining order obtained by P.A.A. against him. R.S. declined visitation with F.A.A. while he was incarcerated and requested a paternity test. The results confirmed that he was F.A.A.'s biological father. R.S. offered his aunt, W.R., as a possible placement for F.A.A. However, W.R. was ruled out by the Division and she did not appeal the decision.

After he was released from prison, R.S. started an alcohol abuse therapy program through Greater Essex Counseling Services (Greater Essex). However, in June 2021, R.S. was terminated from the program for failure to adhere to attendance policies on at least eight days. When the Division attempted to schedule alcohol abuse counseling with a different provider, R.S. rejected the Division's efforts and stated he would obtain his own treatment. By September 2021, R.S. lacked stable housing, moved from one relative's home to another, and worked infrequently. Meanwhile, the Division provided R.S. visitation with F.A.A. from March 2021 until December 2021.

## C. 2022

In 2022, P.A.A.'s attendance at Mt. Carmel Guild was inconsistent and she was transported to a local hospital for screening when she appeared

9

disoriented on at least three occasions. Although Mt. Carmel Guild recommended attendance at their partial care program five days per week, P.A.A. only agreed to attend twice per week. When she consistently attended her therapy sessions, Mt. Carmel Guild reported that there was improvement in her behavior. P.A.A. also attended her therapeutic visitation sessions with F.A.A. throughout 2022.

In an updated psychological evaluation conducted around the end of 2022, Winston opined that although P.A.A. showed moderate improvement, she struggled with "serious psychiatric issues" that "she [was] not consistently able to manage" and that "pose[d] a high risk of harm to her children." According to Winston, even if P.A.A. was compliant with her mental health services, she would still be unable to remediate her mental health issues to be capable of parenting F.A.A. in the foreseeable future.

As for R.S., in the early part of 2022, he still failed to attend any substance abuse treatment despite being court ordered to do so. By June 24, 2022, R.S. attended his intake appointment for substance abuse treatment at Appropriate Place. During intake, he tested positive for alcohol and marijuana, and tested positive for alcohol and marijuana on several occasions throughout June, July and August 2022.

A-3620-23

By August 2022, R.S. was still unemployed and lacked stable housing. He failed to contact two housing assistance agencies to which the Division had referred him. In November 2022, Appropriate Place reported that R.S. had missed several drug screenings, but had been compliant with individual therapy in September, October, and November 2022. Later, R.S. stopped attending therapy sessions because he did not want to participate in the drug screenings. In contrast, during 2022, R.S. consistently attended therapeutic visitation with F.A.A. and P.A.A., with whom he was still involved romantically.

In September 2022, Winston performed a psychological evaluation of R.S.,[2] who admitted drinking alcohol since he was nine years old to the present. The evaluation revealed that R.S. was disinterested in and unmotivated to engage in services to facilitate reunification, lacked empathy, reversed parent-child roles, and had an elevated risk to engage in behaviors that would cause a child harm. Winston determined that R.S. had unaddressed emotional issues that would adversely impact his ability to parent F.A.A. Winston concluded that R.S. was unable to provide F.A.A. with a safe and stable environment and should not be reunified with F.A.A. for the foreseeable future. Winston recommended

---

[2] At the time of the evaluation, R.S. was living with his older brother S.S., whom the Division had ruled out as a placement option because he had a cognitive impairment.

that R.S. participate in alcohol abuse treatment, therapy, psychiatric services, psychoeducation, couple's counseling, and parenting skills classes.

### D. 2023

In 2023, defendants' participation in services remained inconsistent and sometimes nonexistent. Although P.A.A. consistently attended services between January and mid-July 2023, from late July to October 2023, she infrequently attended her partial care program and missed two injections of her medication. She sometimes appeared disheveled, exhibited delusional thinking, and had problems accomplishing basic daily living tasks. When Winston tried to perform an updated psychological evaluation on July 20, 2023, P.A.A. refused to engage with Winston, who commented that P.A.A. still lacked the ability to recognize when she was experiencing a psychiatric episode in order to take proper measures. P.A.A. ultimately re-engaged in medication monitoring and her compliance with services improved by December 2023.

Similarly, between January and June 2023, P.A.A. consistently attended therapeutic visitation with F.A.A. However, during their July 2023 visits, P.A.A. became agitated, incoherent, confused, and paranoid. In August 2023, P.A.A. informed Care Plus that she no longer wanted to attend visitation with F.A.A. and skipped two visitation sessions. From September to December 2023,

12

P.A.A. resumed attending therapeutic visitation with F.A.A. but missed several visits or arrived late on numerous occasions.

As for R.S., by January 2023, he had stopped attending services at Appropriate Place.  Although he briefly resumed, he stopped again by August 2023.  R.S. worked sporadically at various jobs in 2023 but still lacked stable housing.  He was referred to a program by the Division that offered classes, employment training, and support but he failed to attend.  In May 2023, Sostre conducted a psychiatric evaluation of R.S. and diagnosed him with alcohol use disorder.  R.S. admitted to Sostre that he still drank alcohol because he did not believe he had a problem and stated that he had stopped attending Appropriate Place because he did not want to provide urine for screenings.  Sostre recommended that R.S. attend a substance abuse program and therapy, and engage in services aimed at monitoring depression.

On November 16, 2023, McKie visited defendants, who were then living together at an apartment.  McKie found R.S. sleeping in the hallway of the building, smelling of alcohol, and was unable to awaken R.S.  R.S. later admitted to McKie that he had lost consciousness from excessive drinking.  Subsequently, R.S. was re-admitted to Appropriate Place for alcohol abuse, but his urine screenings showed that he continued to use alcohol in December 2023.

A-3620-23

Regarding visitation, R.S. attended therapeutic visitation with F.A.A. and P.A.A. throughout 2023. However, he missed several visits, arrived late, or ended the visit early on several dates. During a September 8, 2023 visit, R.S. stated that his family intended to "snatch[]" F.A.A. and transport her across state lines to prevent the Division from terminating parental rights, causing Care Plus to transfer supervisions of the visits back to the Division. During an ensuing investigation of the incident, R.S. claimed he was only joking.

By the end of 2023, the Division informed the court that the permanency plan for F.A.A. had changed from reunification with defendants to adoption by her resource mother, E.J.

### E. 2024

Both defendants' compliance with services continued to decline in 2024. Although P.A.A. complied with services in the early part of 2024, by May 2024, she announced she would not be returning to Mt. Carmel Guild for services because she felt there was nothing more she needed to learn. As a result, Mt. Carmel Guild terminated P.A.A.'s services because she regularly failed to comply with the program's requirements. Notwithstanding P.A.A.'s belief that she no longer needed services, a March 2024 psychological evaluation revealed that P.A.A. still exhibited symptoms of mental illness that would be exacerbated

by parenting responsibilities. P.A.A. also announced in May 2024 that she no longer wanted visitation with F.A.A.

As for R.S., by April 2024, he continued to live with P.A.A., abuse alcohol, and sporadically attend services. He missed fifteen out of twenty-three group therapy sessions at Appropriate Place and was at risk of being discharged from the program because he had only submitted six urine specimens between January and February, had one positive urine screen during the January and February time period, and failed to submit any urine specimens in March and April. When McKie again visited defendants' apartment in February 2024, R.S. was asleep and smelled of alcohol. When R.S. awoke, he was incoherent and acted aggressively toward McKie.

During a March 2024 psychological evaluation with Elizabeth Stilwell, Psy.D., R.S. admitted to regularly drinking approximately seven and one-half beers per day, but claimed he had decreased his alcohol consumption to only three beers per day. He further admitted that his attendance at Appropriate Place was sporadic but maintained that he could quit drinking if he wanted to do so. Stilwell observed that R.S. did not have a plan for F.A.A.'s care, did not have the ability to parent F.A.A. as a single father, and did not have the capacity to co-parent with P.A.A. Stilwell opined that R.S.'s ability to change was poor.

A-3620-23

R.S.'s Appropriate Place clinician also indicated that R.S. failed to take his substance abuse treatment seriously.

From late 2023 to early 2024, the Division explored D.H., R.S.'s second cousin, and D.H.'s wife, C.M., as a potential placement for F.A.A. Although the Division caseworker explained both KLG and adoption to the couple, they were only interested in adoption. The couple met F.A.A. for the first time in January or February 2024.[3] Subsequently, the Division arranged for visitation between F.A.A. and the couple.

The Division caseworker had also explained to E.J. the differences between adoption and KLG. E.J., who had been F.A.A.'s resource parent since her removal a few days after she was born, consistently expressed her desire to adopt F.A.A. and declined KLG. In February 2024, when the Division explained that it was considering D.H. and C.M. as a potential placement for F.A.A., E.J. remained committed to adoption. Later, E.J. expressed interest in both KLG and adoption, explaining that she would consider KLG if it meant that F.A.A. could remain in her care instead of being transitioned to D.H.'s and C.M.'s home.

---

[3] D.H. may have only met R.S. once or twice as a child and C.M. had never met R.S. prior to the litigation.

A-3620-23

In March 2024, Stilwell conducted bonding evaluations among F.A.A., P.A.A., and R.S.  Stilwell also performed bonding evaluations between F.A.A. and her resource mother E.J., as well as among F.A.A., D.H., and C.M.  Stilwell opined that F.A.A. was securely bonded to E.J. and although F.A.A. would benefit from living with paternal relatives like D.H., the Division's removal of F.A.A. from E.J. would negatively affect F.A.A.'s emotional and behavioral well-being.  However, Stilwell believed F.A.A. would not be severely and enduringly harmed if D.H. could mitigate the harm.

On June 3, 2024, Ingrid Diaz, Ph.D., issued a report detailing her psychological evaluation of P.A.A. as well as her bonding evaluations for F.A.A. with P.A.A., E.J., D.H., and C.M.  According to Diaz, although F.A.A. demonstrated strong attachments to P.A.A., E.J., D.H., and C.M., Diaz found F.A.A. was more securely attached to E.J., D.H., and C.M.  Diaz believed that removing F.A.A. from E.J. would negatively impact F.A.A.'s emotional and social development and thus not be in her best interests.  Although Diaz encouraged KLG because it would give P.A.A. additional time to address her mental illness and develop parenting strategies, Diaz opined that F.A.A. could not be returned to P.A.A. in the near future due to safety concerns.

III.

At the June 2024 guardianship trial,[4] McKie, Stilwell, and C.M. testified for the Division. E.J. testified for the Law Guardian, and Diaz testified for P.A.A. R.S. produced no witnesses. The Division also introduced voluminous records that were admitted into evidence.

In addition to authenticating the Division's records, at trial, McKie recounted the Division's involvement with the family and detailed the services provided to help defendants correct the circumstances that led to F.A.A.'s removal. McKie described defendants' checkered participation in services and confirmed the various individuals who were considered for placement but ruled out. McKie acknowledged that F.A.A. had been placed with E.J. since her removal but complained that, although not documented, during visits to E.J.'s home, the bedroom of E.J.'s two daughters was untidy and they owned a dog that smelled badly.

According to McKie, the Division was not in favor of KLG if the court decided to keep F.A.A. with E.J. because defendants had not resolved their

---

[4] When the Division stated it was considering placing F.A.A. with D.H. and C.M., the Law Guardian requested a best interests hearing prior to any change in placement. The judge held the best interests hearing concurrently with the guardianship trial.

respective parenting deficiencies. Instead, McKie testified it was the Division's plan to remove F.A.A. from E.J. and place her with D.H. and C.M. because of the Division's policy of placing children with biological relatives, notwithstanding the fact that C.M. was uncertain that she and D.H. would maintain a relationship with R.S. should adoption occur.

C.M. testified that although her family was close, she had never met R.S. until the litigation and D.H. had only met R.S. a couple of times. According to C.M., she and D.H. met F.A.A. for the first time in January 2024, after which they began supervised visits followed by weekend visits lasting through the time of trial. During the visits, they never disciplined F.A.A. and took her on trips to exciting places, including Legoland and the American Dream Mall. As a result of these visits, C.M. credited herself with potty training F.A.A.

C.M. testified that she and D.H. lived in the same building as D.H.'s mother and D.H.'s brother. They also had a thirteen-year-old son, who was on the autism spectrum but did not have behavioral issues. C.M. and D.H. were interested in adoption and did not want to enter into KLG even though the two options had been explained to them. If they were allowed to adopt F.A.A., they intended to change her last name and place her in grief counseling to help her adjust to the transition to her new home. C.M. was open to allowing F.A.A. to

have contact with E.J. and wanted F.A.A. to visit defendants, but she was not willing to engage in a set visitation schedule.

E.J. testified that she had been a resource parent since 2014 and had ten children, five of whom were adopted. E.J.'s two adopted daughters, ages seven and eight, as well as her biological son lived at home with her and F.A.A. Her children considered F.A.A. to be family. E.J. expressed her desire to adopt F.A.A. as early as June 2021. She was aware of the KLG option, but had been consistently interested in adoption and reiterated that desire as recently as one month prior to the guardianship trial, despite being confused about filling out a Division form stating her preference. E.J. testified that she was upset to learn that the Division wanted to move F.A.A. to D.H.'s and C.M.'s home. Although E.J. still wanted to adopt F.A.A., she would be willing to enter into a KLG arrangement if it meant that F.A.A. could continue to reside with her.

Stilwell, who was qualified as an expert in psychology in relation to parenting and bonding, recommended termination of parental rights. She opined that neither parent could safely parent F.A.A. now or in the foreseeable future. She stated that P.A.A.'s mental disorders were severe, chronic, and cyclical, meaning that she had periods of stability and periods of decompensation even

20

with compliance with services. In fact, Stilwell was aware of approximately ten prior psychiatric hospitalizations that P.A.A. had experienced.

According to Stilwell, when P.A.A. experienced symptoms associated with her schizoaffective disorder, she lacked insight into how to manage her condition. Her psychotic symptoms included isolating, disorganized thinking, aggressive behavior, and delusions. During these periods, P.A.A. would lose touch with reality and the likelihood of P.A.A. engaging in aggressive or violent behaviors increased, placing a child in P.A.A.'s care at high risk of harm. Stilwell explained that although P.A.A. had been sporadically participating in services for over ten years, she had not made significant progress.

As for R.S., Stilwell explained that his participation in services was sporadic because he consistently refused to stop drinking alcohol and believed that he could abstain without treatment if he wanted to. R.S.'s refusal to commit to sobriety created an unacceptable risk of harm to F.A.A. because R.S. could not independently care for her. Even if R.S. tried to co-parent with P.A.A., F.A.A. would not be safe because R.S. lacked an understanding of P.A.A.'s limitations, needs, and treatment, and R.S. had no basic understanding of parenting skills. According to Stilwell, the likelihood of R.S. changing his behavior was poor.

21

Regarding the bonding evaluations, Stilwell testified that although F.A.A. shared a "positive" bond with defendants, the bond was not a secure attachment. She opined that if their parental rights were terminated, F.A.A. might experience some disruption but not significant or enduring harm that E.J. or even D.H. and C.M. could not successfully mitigate. Stilwell confirmed that F.A.A.'s secure attachment was to E.J. Stilwell observed that E.J. displayed a kind and attentive demeanor to F.A.A., and E.J. was able to soothe and comfort F.A.A. In addition, a bonding sibling group was present among F.A.A. and E.J.'s two daughters. According to Stilwell, F.A.A. demonstrated that E.J. was her primary parent and E.J.'s home was her primary home. Stilwell opined that if F.A.A.'s relationship with E.J. were severed, she would experience trauma and enduring harm.

Stilwell recommended that F.A.A. be "freed for adoption so that she can achieve permanency." However, Stilwell did not state a preference for F.A.A.'s placement between E.J. or D.H. and C.M. She acknowledged that both E.J. as well as D.H and C.M. wanted to adopt F.A.A. and explained that, in general, the placement of a child with relatives has benefits. However, she cautioned that if F.A.A. were to be transitioned out of E.J.'s home, F.A.A. would need behavioral services, family therapy, parent coaching, and other support services to adjust. On the other hand, if F.A.A.'s relationship with D.H. and C.M. were severed,

22

F.A.A. would not experience any harm despite being comfortable and familiar with them.

Stilwell disagreed with Diaz's opinion that P.A.A. and F.A.A. shared a strong bond and disagreed that KLG rather than termination of parental rights was a viable option for F.A.A. In Stilwell's opinion, neither defendant would be able to correct the parenting deficiencies that caused F.A.A.'s removal for the foreseeable future. As a result, Stilwell could not foresee a future where F.A.A. would be safe with either defendant. Further, delaying F.A.A.'s adoption would prevent her from achieving permanency.

Diaz, who was qualified as an expert in complex mental health issues and trauma disorders, supported P.A.A.'s request for KLG rather than termination of parental rights. In addition to opining that F.A.A. was securely attached to P.A.A., Diaz opined that P.A.A. did not have any significant psychological deficits at the time of her evaluation that would affect her ability to parent. In fact, Diaz believed that P.A.A. was good at making decisions and had adequate coping skills.

Diaz wavered on whether P.A.A. would be stable enough to parent F.A.A. if given more time to work toward reunification given P.A.A.'s "[then-]current decompensation." Instead, Diaz only recommended that P.A.A. be given more

time to comply with services if another psychological evaluation indicated it was "something she [could] pull together." Diaz acknowledged that F.A.A.'s bond to E.J. was her strongest bond and that she considered E.J. to be her mother, but Diaz also believed F.A.A. had "a bond" with D.H. and C.M. Although Diaz recommended against removing F.A.A. from E.J.'s care because it would cause long-term trauma and harm to F.A.A., such as depression, anxiety, and substance abuse, she supported KLG with E.J. "with reservation and hesitation" to allow P.A.A. time to achieve stability and reunify with F.A.A.

Following the trial, the judge issued a comprehensive written opinion, concluding that the Division established, by clear and convincing evidence, all four prongs of the best interests standard. The judge terminated defendants' parental rights to F.A.A., awarded guardianship of F.A.A. to the Division for the purpose of adoption, and determined it was in F.A.A.'s best interests to remain with E.J. with the goal of adoption. In her decision, the judge recounted each witness's testimony, assessed the credibility of each witness, and made detailed factual findings consistent with those assessments. The judge recited the procedural history of the case, provided a full analysis of the statutory factors, and applied the governing legal principles.

A-3620-23

In her credibility assessments, the judge found Stilwell and E.J. credible. Stilwell "answered questions clearly and thoughtfully" and E.J. "did not embellish or exaggerate her testimony." Although the judge found Diaz credible, she did not credit "several of her conclusions," finding them "speculative" and "even hopeful, but without support in the record." In particular, the judge rejected Diaz's conclusions that P.A.A. "would benefit from more time" and that KLG "should be the plan."

As for C.M., although "she was not evasive" and "made appropriate eye contact," the judge "found her overall testimony to be less than credible" because "[s]ome of her testimony was inherently questionable" and she "was motivated to testify in the most positive light to show the court she was the best placement for [F.A.A.]." Although the judge found McKie "somewhat credible" in that "[h]e had a command of the facts contained in the Division file" and "did not guess or speculate,"

> [his] demeanor led th[e] court to find he was biased towards [C.M. and D.H.] in a manner beyond his professional capacity. He embellished when discussing the condition of [E.J.'s] home and [F.A.A.'s] appearance even though for years there were no issues with [E.J.'s] home or her care of [F.A.A.] and it was not until the relatives surfaced that his views changed. . . . Further, his manner in responding to the Law Guardian and [P.A.A.'s] counsel's questions was quite different

than when responding to the Deputy Attorney General. He was short and almost sarcastic at times.

The judge went on to address each prong in turn. As to prong one, the judge determined that as a result of "[P.A.A.'s] mental health and [R.S.'s] failure to remediate his alcohol abuse," F.A.A.'s "health, safety and wellbeing have been endangered and will continue to be endangered if the relationship[s] with [defendants] were to remain intact." The judge explained:

> [P.A.A.] has suffered with significant mental health issues for nearly two decades. To her credit she has spent considerable effort attending and participating in various programs and medication monitoring, even during the COVID-19 pandemic. She has regularly risen to the challenges of her mental health diagnoses. Unfortunately, as noted by . . . Stilwell, [P.A.A.'s] "mental health is cyclical meaning that she has periods of relative stability and periods of decompensation." Even though [P.A.A.] receives injections, she continues to have periodic episodes of decompensation. . . . Stilwell opined that the "ordinary demands of parenting are likely to be overwhelming to [P.A.A.] and would place her at risk of future decompensation[,] which in turn would place any child in her care at risk." This cycle was apparent even at the time of trial as [P.A.A.] had been recently discharged from Mount Carmel Guild, [was] not participating in any treatment or medication monitoring, and was visibly decompensating. Even being aware of her triggers is not enough to maintain the necessary stability. As . . . Stilwell testified, [P.A.A.] is unaware it is happening and does not reach out for help which puts any child in her care at risk. To be clear, [P.A.A.] is not at fault for her mental illness and its ongoing effects on her and her

26

family. . . . But simply because a parent is "morally blameless" is not enough to find in their favor. <u>N.J. Div. of Youth and Family Servs. v. A.G.</u>, 344 N.J. Super. 418, 438 (App. Div. 2001). If a mental illness affects a parent's ability to carry out the normal and expected functions of parenting, that can be the basis for a termination of parental rights.

Conversely, [R.S.'s] persistent and conscious alcohol abuse has put [F.A.A.'s] well-being and safety at risk. His refusal to appreciate the consequences of his drinking despite being aware of his propensity for alcoholism and his abject failure to meaningfully participate in substance abuse treatment rendered him utterly incapable of being that co-parent that [P.A.A.] could have had to have [F.A.A.] returned to her custody. . . . [R.S.] sporadically attended substance abuse treatment and notably refused to provide urine screens. On May 6, 2024, he ceased attending any substance abuse treatment despite the pending trial. In fairness, however, he was relatively consistent with visits with [F.A.A.] throughout the time she has been in placement.

[(Citations omitted) (citation reformatted).]

For the same reasons, the judge found the Division established prong two. The judge added that "despite [P.A.A.'s] desire, [she] is unable to become fit within time to assume the parental role necessary to meet the child's needs." On the other hand, the judge stated that R.S. "has no desire to avail himself of the assistance provided to help reunify him with [F.A.A.] or be a co-parent for [P.A.A.]" and "has continued to delay permanency for [F.A.A.]"

27

As to prong three, the judge found

> [t]here [was] little dispute that the Division ensured that [defendants] were provided with services in an attempt to further the goal of reunification. [P.A.A.] was provided with mental health treatment, transportation, and visitation. [R.S.] was provided with substance abuse treatment, transportation, and visitation. They were both referred for multiple psychological and psychiatric evaluations as well as bonding evaluations.

Likewise, according to the judge, "[t]he Division explored alternatives to the termination of . . . parental rights including assessing the offered relative placement options." However, the judge concluded "it [was] in the best interest of [F.A.A.] to remain with [E.J.] under a plan of adoption," rather than a KLG relationship with E.J. or adoption by D.H. and C.M. In support, the judge explained that while "KLG [was] an equally available permanency plan," it was "not the preferred plan." The judge acknowledged that "[t]he preference language in the [2021] amendment to the kinship statute 'was clearly intended to reflect a preference for viable kinship guardians and fit parents over unrelated foster caretakers.'" (quoting N.J. Div. of Child Prot. and Permanency v. D.C.A., 474 N.J. Super. 11, 27 (App. Div. 2022), aff'd, 256 N.J. 4 (2023)).

However, the judge found that

> [n]o expert evidence was presented that [F.A.A.] should be placed with [D.H. and C.M.], to the contrary, the one expert who expressed an opinion on placement, . . .

Diaz, testified that it would be in [F.A.A.'s] best interest to stay with [E.J.] . . . Stilwell specifically stated that she did not offer an opinion on placement. Both experts opined that [E.J.] and [F.A.A.] have a strong and secure attachment. Neither expert was committed to that opinion with regard to [D.H. and C.M.] Both experts agreed that there would be a reaction or perhaps a harm if she was removed from [E.J.], and both experts agreed that there would be no harm if [F.A.A.] ceased her visits with [D.H. and C.M.]

Lastly, as to prong four, the judge concluded that "terminating the parental rights of [defendants] will not do more harm than good." In support, the judge explained:

Stilwell opined that [F.A.A.'s] attachment to [defendants] is a positive relationship, but not a healthy and secure bond. Conversely, her attachment to [E.J.] is a healthy and secure one. She testified that if [defendants'] parental rights were terminated, [F.A.A.] might experience some disruption because she has been having visits with them, however she would not experience any significant or enduring harm. She further testified that [E.J.] would be able to successfully mitigate any harm. . . . Diaz testified that [F.A.A.'s] strongest bond is with [E.J.]

The judge entered a memorializing order and these appeals followed.

## IV.

Our scope of review on appeals from orders terminating parental rights is limited. N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018). In such cases, we will generally uphold the trial court's

factual findings, so long as they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

Indeed, we give substantial deference to Family Part judges' special expertise and opportunity to observe the witnesses firsthand and evaluate their credibility, id. at 552-53, "and to gain a 'feel of the case' over time, thus supporting a level of factual familiarity that cannot be duplicated by an appellate court reviewing a written record," N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 220-21 (App. Div. 2013) (quoting E.P., 196 N.J. at 104). "We also defer to the trial court's assessment of expert evaluations." Id. at 221. Thus, a termination decision should only be reversed or altered on appeal if the trial court's findings are "so wholly unsupportable as to result in a denial of justice." P.P., 180 N.J. at 511 (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

Even where the parent alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be accorded unless the judge "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279

(2007) (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993); and then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).  However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."  R.G., 217 N.J. at 552-53 (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Guided by these standards, we are satisfied the judge's factual findings are amply supported by credible evidence in the record, and her legal conclusions are sound.  The judge made copious findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met, by clear and convincing evidence, the legal requirements for a judgment of guardianship.  The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and comports with applicable case law.  See, e.g., N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447-54 (2012); E.P., 196 N.J. at 102-11; K.H.O., 161 N.J. at 347-63; In re Guardianship of DMH, 161 N.J. 365, 375-94 (1999); N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 602-11 (1986).

Moreover, as public policy increasingly focuses on a child's need for permanency, it has resulted in the placement of "limits on the time for a birth

parent to correct conditions in anticipation of reuniting with the child." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004); see also A.G., 344 N.J. Super. at 438 ("Keeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law."). To that end, the emphasis has "shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." C.S., 367 N.J. Super. at 111 (citing N.J.S.A. 30:4C-11.1).

That is because "[a] child cannot be held prisoner of the rights of others, even those of [the child's] parents. Children have their own rights, including the right to a permanent, safe and stable placement." Ibid. The question then is "whether the parent can become fit in time to meet the needs of the child[]." N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 263 (App. Div. 2005); see also P.P., 180 N.J. at 512 (observing that even if a parent is trying to change, a child cannot wait indefinitely); N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996) (holding that the "termination action was not predicated upon bonding, but rather reflected [the child's] need for permanency and [the defendant's] inability to care for him in the foreseeable future"). The judge's findings are therefore supported by both the law and the public policy behind it.

In disputing the judge's findings as to prongs one and two, P.A.A. asserts that mental illness alone is not sufficient to justify the termination of parental rights and her relative compliance with services showed her willingness to address her mental health problems. However, "a psychiatric disability can render a parent incapable of caring for his or her children." N.J. Div. of Youth & Fam. Servs. v. I.Y.A., 400 N.J. Super. 77, 94 (App. Div. 2008); see also A.G., 344 N.J. Super. at 438-39 (affirming an order terminating a mother's parental rights to her son because the expert medical testimony clearly established the mother's lengthy history of mental illness prevented her from raising her son).

Moreover, the standard is not merely whether a parent is unwilling to eliminate the circumstances that led to the child's removal, but whether the "parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child." N.J.S.A. 30:4C-15.1(a)(2) (emphasis added). Although there were periods when P.A.A. participated in services, there was substantial credible evidence in the record that P.A.A. would still experience episodes of psychosis, despite compliance with her medication regimen, and could not recognize when she was having a manic or depressive episode. Given the nature and pervasiveness of her mental disorder, P.A.A. was unable to eliminate the risk of harm to F.A.A. despite her

willingness to attend services. In Stilwell's March 8, 2024 psychological evaluation of P.A.A., she concluded that parental responsibilities would exacerbate P.A.A.'s disorders and place F.A.A. at a heightened risk of harm. What is more, there is evidence in the record, both documentary and testimonial, that P.A.A. acted aggressively on multiple occasions while undergoing an episode. Thus, the judge's findings that prongs one and two were established as to P.A.A. is fully supported by the credible evidence in the record and we reject P.A.A.'s contentions to the contrary.

We also reject R.S.'s challenge to the judge's findings of prongs one and two and his claim that he never harmed F.A.A. because he never lived with her. He also asserts he was not unwilling to eliminate any putative harm to F.A.A. because he attended substance abuse treatment despite disagreeing that he had an alcohol problem. The record is replete with credible evidence that R.S. has an unresolved alcohol abuse problem, has experienced periods of transience and joblessness, and his prognosis for change is poor. "[I]njury to children need not be physical to give rise to State termination of biological parent-child relationships. Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re

Guardianship of K.L.F., 129 N.J. 32, 43-44 (1992) (citing In re Guardianship of J.C., 129 N.J. 1, 18 (1992)).

Harm may also be caused by a parent's failure to provide "attention and concern" for a child, A.W., 103 N.J. at 613, and by the parent's "failure to take responsibility for [the] child[] and to perform any substantial parental functions," DMH, 161 N.J. at 383; see ibid. (holding that parental rights may be terminated based upon risk of harm, even in the absence of physical harm); see also B.G.S., 291 N.J. Super. at 591-93 (holding that the parent's failure to provide a permanent home, causing child to suffer psychological damage, may authorize termination of parental rights).

R.S. had ample opportunities to participate in substance abuse treatment but was unwilling to comply. He had poor attendance at the programs, and many of the urine samples he submitted were positive for alcohol. In addition, the Division provided R.S. with information to obtain housing but he never contacted the agencies. At various times, R.S. reported that he had housing with either his brother or with P.A.A., but residing in those locations did little to encourage him to attend services to achieve reunification with F.A.A. Instead, R.S. made little to no effort to become a viable parent for F.A.A., failed to complete treatment, and continued to abuse alcohol. Indeed, R.S.'s excessive

A-3620-23

consumption of alcohol rendered him unconscious on occasion. R.S.'s behavior demonstrated that he did not want to reunify with F.A.A. and had no interest in co-parenting with P.A.A.

Likewise, we reject R.S.'s contention that the services the Division provided to him were unreasonable. Under prong three, "[t]he diligence of [the Division's] efforts on behalf of a parent is not measured by their success[,] . . . [but] must be assessed against the standard of adequacy in light of all the circumstances of a given case." DMH, 161 N.J. at 393. "[E]ven [the Division's] best efforts may not be sufficient to salvage a parental relationship," F.M., 211 N.J. at 452, and "[e]ven if the Division had been deficient in the services offered to [the parent], reversal would still not be warranted, because the best interests of the child controls," N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007). Here, the Division provided ample services tailored to R.S.'s needs but he failed to avail himself of the opportunities.

In his challenge to the judge's prong three findings, R.S. asserts that alternatives to termination of parental rights were not considered because D.H. and C.M. wanted to care for F.A.A. "As part of its analysis of the third prong, the court is required to consider alternatives to the termination of parental rights." H.R., 431 N.J. Super. at 226 (citing N.J.S.A. 30:4C-15.1(a)).

Alternatives to termination of parental rights can include placement with a relative, N.J.S.A. 30:4C-12.1(a), or the creation of a KLG arrangement, <u>N.J. Div. of Youth & Fam. Servs. v. L.L.</u>, 201 N.J. 210, 222-23 (2010). Reunification is not an alternative, however, if the child could be harmed if returned to the parent. <u>A.W.</u>, 103 N.J. at 605.

Contrary to R.S.'s claim, the judge considered alternatives to termination of parental rights when she determined that F.A.A. should be adopted by E.J. D.H. and C.M. were not interested in a KLG arrangement but wanted to adopt F.A.A. Additionally, neither expert advocated for F.A.A.'s KLG placement with D.H. and C.M. Further, KLG was not a true alternative for E.J. because her long-stated desire was to adopt F.A.A. and she only considered KLG when she thought F.A.A. would be removed from her care. The judge observed that F.A.A.'s visits with D.H. and C.M. were enjoyable because the visits were for short periods, involved enjoyable activities, and F.A.A. was not subject to much discipline.

In contrast, there was no dispute by the experts that E.J. was F.A.A.'s primary attachment figure. Although Stilwell did not offer an opinion on where F.A.A. should be placed, Stilwell stated that F.A.A. would not experience harm if her relationship with D.H. and C.M. were severed, but that F.A.A. would

37

suffer harm if she were removed from E.J. Diaz also opined that F.A.A. would suffer long-term harm if removed from E.J. Stilwell also pointed out that E.J. facilitated F.A.A.'s sibling visits and that F.A.A. shared a sibling bond with E.J.'s other daughters. The record amply supports the judge's decision that termination of parental rights followed by adoption by E.J. served F.A.A.'s best interests more than placement with D.H. and C.M.

For the same reason, we reject P.A.A.'s argument that the judge should have ordered KLG with E.J. E.J.'s desire to adopt F.A.A. was consistent. N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 274-75 (App. Div. 2019) (explaining that evidence that establishes a resource parent's clear and informed preference for adoption will support a trial court's finding that there are no alternatives to termination of parental rights). E.J. only agreed to consider KLG out of fear that F.A.A. would be removed from her home.

P.A.A. contends the judge erred when she found that her mental illness barred KLG. She asserts that the 2021 Amendments indicate a legislative preference for KLG over adoption and the judge erred by not placing F.A.A. with E.J. under a KLG arrangement. Similarly, R.S. argues that the 2021 Amendments require the Division to place children with biological relatives and, as a result, the Division should have placed F.A.A. with D.H. and C.M.

In 2021, the Legislature amended Title 3B, governing KLG proceedings. L. 2021, c. 154, § 4. The Legislature removed the requirement that courts find "adoption of the child is neither feasible nor likely" before courts can appoint a caregiver as a kinship legal guardian. Compare L. 2021, c. 154, § 4 (current N.J.S.A. 3B:12A-6(d)(3)), with L. 2006, c. 47, § 32 (prior version). As amended, the KLG Act ensures that a resource parent's willingness to adopt no longer forecloses KLG, making KLG an equally available permanency plan for children in Division custody. See N.J.S.A. 3B:12A-6(d)(3). However, nothing in the amendment implies KLG by relative resource parents is the preferred outcome over adoption, see D.C.A., 474 N.J. Super. at 27-28, and "awarding kinship legal guardianship" must still be "in the child's best interests," N.J.S.A. 3B:12A-6(d)(4). Although the amendments ensure that a caretaker's willingness to adopt no longer forecloses KLG, they do not render KLG a categorical bar to termination of parental rights.

We reject R.S.'s argument that the judge should have approved F.A.A.'s placement with D.H. and C.M. The 2021 Amendments specifically state that "[k]inship care," not KLG, is "the preferred resource" for the placement of a child "who must be removed" from his or her birth parents. L. 2021, c. 154, § 1(b); see also S. Health, Hum. Servs. & Senior Citizens Comm. Statement to S.

39

3814, at 3 (June 10, 2021) (clarifying that court is required to first consider placement of child with relative or person with kinship relationship when determining if child should be placed in custody of another suitable person); M.M. v. Dep't of Child. & Fams., 479 N.J. Super. 471, 491 (App. Div. 2024) (eschewing an interpretation of the 2021 amendments "favoring kinship and relative placements" with "family member[s] 'at all costs'").

Here, the Division did consider relatives as possible kinship placements upon F.A.A.'s removal. Specifically, the Division considered T.A. and W.R., before ruling them out. Due to T.A.'s inability to care for F.A.A., F.A.A. remained with E.J., where the Division had placed her. F.A.A. remained with E.J. while W.R. was considered and ruled out. Once the Division became aware of D.H. and C.M., it arranged for visitation, including overnight visitation, and evaluated them as potential long-term caregivers for F.A.A. However, at that point, nearly three years had passed. During that time, F.A.A. had been continuously in the care of E.J.

Thus, the 2021 Amendments were not violated by the Division's placement of F.A.A. with E.J. The plain text of the statute presumes that the preference for "kinship care" is applicable when the placement is made around the time of removal. L. 2021, c. 154, § 1(b); see also DiProspero v. Penn, 183

N.J. 477, 492 (2005) (explaining that when interpreting a statute, courts will give words their "ordinary meaning and significance." (citing Lane v. Holderman, 23 N.J. 304, 313 (1957))). Under the statute, the judge was not required to remove F.A.A. from E.J. and place her with D.H. and C.M. because the original removal had occurred years earlier. Instead, the judge considered the totality of the circumstances and determined what was in F.A.A.'s best interests. See D.C.A., 474 N.J. Super. at 26 (explaining that 2021 Amendments do not alter ultimate consideration that court must determine what is in child's best interests).

Notably, one of the reasons the Legislature cited for promoting kinship care was to maintain a connection to the biological family, as well as that family's cultural traditions. Indeed, the purpose of the 2021 Amendments is not only to protect children, but also to protect and preserve parental rights by maintaining familial connections through cultural traditions while offering children safety and stability. L. 2021, c. 154, § 1(b).

However, here, D.H. and C.M. had no relationship with defendants. Stilwell testified it was unclear what relationship, if any, D.H. and C.M. had with R.S.'s side of the family, and the judge noted that C.M. primarily discussed relatives on her side of the family, who had no biological connection to R.S. As

41

a result, the judge determined there was no difference between F.A.A. spending time with C.M.'s relatives as opposed to E.J.'s family. We are satisfied the judge did not misinterpret or misapply the 2021 Amendments. Rather, the 2021 Amendments support the judge's course of action and analysis.

As for prong four, R.S. accuses the judge of terminating his parental rights based on a faulty conclusion that F.A.A. was "better off" being placed with E.J. He relies on his attendance at visitation to support his argument.

> The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship. C.S., 367 N.J. Super. at 119. When a bond exists between the child and the caretaker parent, and the biological parents cannot correct their poor conduct, the termination of their parental rights will not do more harm than good. E.P., 196 N.J. at 108. If the separation of the child from the caretaking parents will cause serious harm, then the fourth subpart is fulfilled. Id. at 108-09. The court can rely on expert testimony to make the relevant determination. J.C., 129 N.J. at 19. Overall, the court's focus should be on the child's need for permanency. M.M., 189 N.J. at 281.
>
> [H.R., 431 N.J. Super. at 226-27 (citations reformatted).]

See also D.C.A., 474 N.J. Super. at 28 (explaining that "courts must, at the very least, consider the child's bond to a current placement when evaluating prong four").

Here, the record supports the judge's conclusion that F.A.A. would be harmed if reunified with R.S. and if her bond with E.J. was severed. That conclusion is supported by undisputed expert testimony regarding the consequences that would result from termination of parental rights and F.A.A.'s need for permanency. At the time of trial, F.A.A. had been out of the home for over three-and-one-half years, during which time R.S. had failed to engage in services on a consistent basis and F.A.A. had become securely attached to E.J. Under the circumstances, we discern no reason to disturb the judge's finding that prong four was satisfied.

For the first time on appeal, P.A.A. raises various evidence arguments, claiming the judge showed bias against her by admitting and considering certain evidence. Specifically, she asserts the judge erred when she took judicial notice of orders from other docket numbers[5] and admitted certain contact sheets prepared by McKie. P.A.A. also complains that McKie should have been sequestered prior to testifying and that the judge erred by not entering a sequestration order sua sponte.

Because P.A.A. did not object at trial, we review for plain error. Under the plain error standard, P.A.A. carries the burden of demonstrating that the error

---

[5] The questioned orders were not provided in the record on appeal.

was "of such a nature as to have been clearly capable of producing an unjust result" and therefore should not be disregarded by this court. R. 2:10-2. "The mere possibility of error is insufficient for reversal," N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 622 (App. Div. 2010), and "[r]elief under the plain error rule, R. 2:10-2, at least in civil cases, is discretionary and 'should be sparingly employed,'" Baker v. Nat'l State Bank, 161 N.J. 220, 226 (1999) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)).

In her written opinion, the judge took judicial notice of court orders from other cases pertaining to the Division's involvement with P.A.A. and another daughter. Judicial notice allows the court to promote judicial economy by precluding the necessity of proving facts that cannot seriously be disputed and are either generally or universally known. N.J.R.E. 201(b)(1). A court may take judicial notice on its own as a matter of discretion. N.J.R.E. 201(c). Pursuant to N.J.R.E. 201(b)(4), a court may judicially notice records of the court in which the action is pending or of any other court of the State of New Jersey, among others. For example, pleadings in prior litigation between the same parties were judicially noticed in Schweizer v. MacPhee, 130 N.J. Super. 123, 125 n.2 (App. Div. 1974); see also Twp. of Brick v. Vannell, 55 N.J. Super. 583, 587-88 (App. Div. 1959) (holding that court may take judicial notice of trial record of prior

44

court proceeding). Moreover, N.J.R.E. 201(e) explicitly contemplates that a court may take judicial notice "before notifying [the] part[ies]."

We are convinced that the judge taking judicial notice of the prior court orders does not rise to the level of plain error. The information contained in the prior orders was undisputed, admissible, and the proper subject of judicial notice. Although it would have been preferable for the judge to provide advance notice of her actions, a review of the judge's opinion terminating P.A.A.'s parental rights to F.A.A. dispels any doubt that the judge relied upon the facts adduced in the prior proceedings in reaching her decision.

We also reject P.A.A.'s contention that the judge erred by admitting McKie's contact sheets referencing the February 25, 2021 visitation session recounting McKie's observation of P.A.A. pushing F.A.A.'s head downward into the changing pad. Division reports are generally admissible under the N.J.R.E. 803(c)(6) business record exception to hearsay. N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 495-96 (App. Div. 2016); see R. 5:12-4(d) (providing that the Division "shall be permitted to submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants"). Because "requiring all [Division] personnel having contact with a particular case to give live testimony on all the matters within

their personal knowledge would cause an intolerable disruption[,] . . . it becomes necessary to allow certain evidence to be produced in a hearsay form." N.T., 445 N.J. Super. at 496 (alteration in original) (quoting In re Guardianship of Cope, 106 N.J. Super. 336, 343 (App. Div. 1969)).

Therefore, statements to the report's author "by Division 'staff personnel . . . [made based on] their own first-hand knowledge of the case, at a time reasonably contemporaneous with the facts they relate, and in the usual course of their duties with the' Division" are admissible. Ibid. (alteration in original) (quoting Cope, 106 N.J. Super. at 343); see A.W., 103 N.J. at 595 n.1 (same); see also N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 346-47 (2010) (allowing for admission of documentary evidence from the Division); N.T., 445 N.J. Super. at 487 (discussing requirements for admitting Division reports under N.J.R.E. 803(c)(6)).

Because the Division contact sheet was admissible as a business record, there is no plain error. It was prepared by McKie in connection with his position as a Division caseworker approximately thirteen days after the incident. Importantly, the judge relied on McKie's trial testimony, rather than the contact sheet, in considering the incident and did not find that P.A.A. suffocated F.A.A. or caused her bodily harm during the incident.

Equally unavailing is P.A.A.'s contention that McKie should have been sequestered sua sponte because he embellished his trial testimony about the visitation incident only after hearing Stilwell's trial testimony referring to the incident as P.A.A.'s attempt to "suffocate" F.A.A.

"Sequestration of witnesses is governed by N.J.R.E. 615, which states, '[a]t the request of a party or on the court's own motion, the court may, in accordance with [the] law, enter an order sequestering witnesses.'" State v. Williams, 404 N.J. Super. 147, 159 (App. Div. 2008) (first alteration in original) (italicization omitted) (quoting N.J.R.E. 615). "Sequestration is discretionary with the trial judge." Id. at 159-60 (citing State v. Miller, 299 N.J. Super. 387, 399 (App. Div. 1997)). "Its purpose is 'to prevent prospective witnesses from hearing what the other witnesses detail in their evidence, "for the less a witness hears of another's testimony, the more likely is [the witness] to declare his [or her] own knowledge simply and unbiased."'" Id. at 160 (quoting State v. DiModica, 40 N.J. 404, 413 (1963), overruled on other grounds by State v. Czachor, 82 N.J. 392 (1980)). "Absent a clear showing of prejudice an inadvertent violation of a sequestration order does not trigger automatic exclusion of the witness'[s] testimony." Ibid.

McKie's presence in the courtroom during trial did not constitute error "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. The visitation incident was not the basis for the judge's decision to terminate P.A.A.'s parental rights. In the absence of a clear showing of prejudice, we discern no plain error.

Finally, to the extent we have not expressly addressed any of defendants' arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hawley

Clerk of the Appellate Division

A-3620-23